David Levy, J.
This is a motion by plaintiffs to amend their complaint pursuant to CPLR 3025 to assert an additional cause of action. In the original complaint plaintiff, Lena Kaplan, and her husband, Max Kaplan, tenants, sought damages allegedly incurred as a result of the negligence of the landlord when a kitchen cabinet in the apartment fell and struck and injured Lena Kaplan. Plaintiffs claimed actual and constructive notice to the landlord.
Plaintiff seeks to add a cause of action for damages based upon the breach by the landlord of an implied warranty of habitability. Such a cause of action seems to be based upon a theory of strict liability upon the part of the landlord similar to the breach of the implied warranty of merchantability in the products liability cases. In this situation the plaintiffs seek to make the landlord liable without proof of notice to him of any defect.
It was the rule for a very long time in our courts that on a motion to amend a pleading the merits of the proposed amendment would not be examined. (Sunshine v Green Bus Lines, 41 Misc 2d 1037.) In 1970, the Appellate Division, First *746 Department, departed from this rule and refused several amendments of a complaint on the ground that none of the amendments stated a cause of action. (East Asiatic Co. v Corash, 34 AD2d 432.) In doing so the court stated (p 434): "Special Term granted the motion to amend without passing upon the validity of the causes of action as amended. While this practice has several precedents respectable because of their age, it represents a procedure which is no longer tolerable * * * We can no longer afford the time or judicial manpower for the repeated applications for the same relief which necessarily result from postponing decision.”
Consequently, it seems clear to this court that it is incumbent upon it to determine whether or not the amended complaint states a cause of action.
Until recently, the law in this State as to leases was caveat lessee. (O’Brien v Capwell, 59 Barb 497.) The rule, adopted from English common law, was originally promulgated in an agrarian society where leases were considered conveyances of an interest in real property. The doctrine of caveat lessee was probably of little concern to the agrarian leaseholder of the sixteenth and seventeenth century (2 Powell, Real Property, par 233, pp 300-301). He was capable of inspecting the real estate for defects prior to the inception of the lease, for even if there were improvements on the property, they were relatively simple in design. As for the defects arising during the term of the lease, he probably had both the skill and the financial resources to make the necessary repairs. (Javins v First Nat. Realty Corp., 428 F2d 1071.) However, as the agrarian leaseholder was replaced by the urban tenant, the rule of caveat lessee became less and less appropriate to the landlord-tenant relationship. As buildings became more complicated and expensive to repair, and as the tenant population became more mobile, many tenants found themselves occupying dwellings which they had neither the expertise nor the funds to repair. Modern residential tenants did not regard a lease as a conveyance of land. It was an obligation to provide a dwelling place and essential services. A lease was no longer a simple conveyance of real estate. It was a complex document containing numerous express covenants regulating the landlord-tenant relationship.
Out of this change in the nature of leasing in today’s world, came the decision in May, 1975 of Tonetti v Penati (48 AD2d 25, 29) which recognized a "warranty of habitability and *747 fitness for the purpose intended,” when a landlord leased premises for residential use. In addition, in August, 1975, the New York Legislature adopted section 235-b of the Real Property Law (L 1975, ch 597, § 1, eff Aug 1, 1975) enacting a "warranty of habitability,” in all written and oral leases for residential purposes. The warranty means that the "premises * * * are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental to their life, health or safety.” (Real Property Law, § 235-b).
The incident in this case occurred in November, 1974 and clearly this statute, appearing to be substantive law, unless declarative of the common law, does not and cannot speak retroactively. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 53; People v Dilliard, 252 App Div 125.) The Tonetti case (48 AD2d 25, supra) merely declared the common law and therefore is clearly applicable. The statute does illustrate some of the content of the term "warranty of habitability,” and, in that sense, is useful in this matter. Of course, if we assume that the warranty of section 235-b is declarative of the common law, then, of course, it too would apply to this case.
At common law and in the State of New York until 1929, a landlord had no duty to repair leased premises. (Emigrant Industrial Sav. Bank v 108 West 49th St. Corp., 255 App Div 570, affd 280 NY 791.) A landlord became obligated to make repairs and became liable for negligently failing to do so upon the enactment of section 78 of the Multiple Dwelling Law. (Moore v Bryant, 27 Misc 2d 22.) The courts engrafted upon section 78 of the Multiple Dwelling Law the requirement of notice. (Becker v Manufacturers Trust Co., 262 App Div 525, rearg den 263 App Div 810.) In summary then, we can see the development of the tort law of landlord-tenant from a tenant’s inability to sue a landlord for negligence, at common law, to the adoption of section 78 of the Multiple Dwelling Law in 1929, giving a cause of action to a tenant for negligence of a landlord in failing to make repairs, provided the landlord had notice of the defect, actual or constructive.
Since 1929 along with the development of the law concerning leases, culminating in the implied warranty of habitability, and the developing tort liability of a landlord has been a concomitant development in the field of tort law, i.e., products liability. From the days when only a purchaser in privity of *748 contract with the seller could sue, we have progressed through the elimination of the privity requirement, though retaining negligence, to the latest cases imposing a strict liability upon a manufacturer or seller of a product. In this context plaintiffs attempt to analogize the implied warranty of habitability to that of merchantability, and a landlord to a manufacturer or seller, and to impose strict liability.
Clearly, at this juncture in the development of the law a second look is needed at the responsibility of a landlord (at least one who is in the business of leasing) to his residential tenant. Is a cause of action in negligence, requiring actual or constructive notice to the landlord, the answer, or is strict liability a theory of liability whose time has come?
There are no easy answers to this question, and the foregoing discussion was intended to put the issue in historical perspective.
History, nevertheless, does not provide us with the answer, as there is nothing in the history of the law of leases, of tort law or products liability that necessitates imposing a rule of strict liability upon a landlord. The answer lies in the resolution of the conflicting policies that press in on all sides on this question.
Militating against strict liability are several persuasive arguments. First, a lease is not a sale of a product. Second, an apartment may be new or, more likely, many years old. Should a landlord of a 40-50-year-old apartment be held strictly liable? Third, some defective conditions may exist at the time of the letting, while others may occur weeks, months or years after the letting. Is the warranty to be a continuing one and, if so, for how long? Fourth, the landlord may have constructed the building or purchased it when it was 30, 40 or 50 years old. In the case of a new building he may still have recourse against his suppliers and contractors, but in an old building he probably would not have such recourse and may not even know who created the defective condition. Fifth, isn’t the notice requirement based upon the idea that the tenant and not the landlord has possession and control of the apartment, and therefore, the tenant should be required to notify the landlord so that the landlord may take corrective action? If neither party had notice why should the landlord be liable?
In addition, the highest court of the State of New Jersey has considered and ruled upon the question. (Dwyer v Skyline Apts., 123 NJ Super 48, affd 63 NJ 577.) There, the plaintiff, a *749 tenant for 15 years in defendant’s apartment development, was scalded when she turned on the bathtub hot water faucet and the entire fixture came out of the tile. The accident occurred because that portion of the faucet which was in the wall had become corroded. The court described the condition as a "latent defect unknown to the tenant, unknown to the landlord and not discernible on a reasonable inspection.” The court then stated that the underlying reasons for enforcement of strict liability against the manufacturer or seller of products do not apply to the ordinary landlord of multiple dwellings, and then made the following distinctions:
(1) A landlord is not engaged in mass production whereby he places his product — the apartment — in a stream of commerce exposing it to a large number of consumers; (2) he has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly; (3) he does not have the expertise to know and correct the condition, so as to be saddled with responsibility for a defect regardless of negligence; (4) an apartment includes several rooms with many facilities constructed by many artisans with differing types of expertise, and subject to constant use and deterioration from many causes; (5) it is a commodity wholly unlike a product which is expected to leave a manufacturer’s hands in a safe condition with an implied representation upon which the consumer relies; (6) the tenant may expect that at the time of letting there are no hidden dangerous defects known to the landlord of which the tenant has not been warned, but he does not expect that all will be perfect in his apartment for all the years of his occupancy; (7) to apply strict liability would impose an unjust burden on property owners; how can a property owner prevent a latent defect or repair when he has no way of detecting it? And if he can’t prevent the defect, why should he be liable?
Clearly, there are quite compelling arguments against imposing strict liability upon a landlord as a result of a breach of the implied warranty of habitability.
Arrayed against these arguments are the policy considerations behind strict liability as to products and the policy trend in tort and landlord and tenant law. It has been held that a car rental agency, a bailor for hire, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer. Therefore, the offering to the public of trucks and pleasure vehicles for hire necessarily carries with it a repre *750 sentation that they are fit for operation, and it applies to a new or used vehicle. The content of such warranty must be that the car will not fail mechanically during the rental period. (Cintrone v Hertz Truck Leasing & Rental Serv., 45 NJ 434.)
Similarly, an appellate court in California has applied strict liability to a landlord when a tenant in a furnished apartment injured her back when she fell through a couch with defective supporting straps. Two of four straps were missing and the remaining straps were loose. The landlord had purchased the couch one year before the accident, but the plaintiff was the first tenant to use it. The court applied the doctrine of strict liability to the landlord as a lessor of personal property, not as a lessor of real property. (Fakhoury v Magner, 25 Cal App 3d 58.) In so holding the court extended the line of cases illustrated by Cintrone (45 NJ 434, supra), concerning a lessor of personal property to a landlord of a furnished apartment. An implied warranty has been attributed to a sale of realty to the effect that the house will be erected in a reasonably workmanlike manner and will be reasonably fit for human habitation. (Schipper v Levitt & Sons, 44 NJ 70.) There the court concluded that the failure to install a mixing valve caused the scalding of an infant plaintiff.
One reason for imposing strict liability upon a seller of a product is that the seller has superior knowledge and is in a better position to prevent defects, while the consumer is encouraged to rely on his skill, reputation and implied warranty of safety. Nevertheless, no matter how many tests and inspections a manufacturer performs and whether or not he is aware of the defect, if the defect exists and is the proximate cause of the injury, he is held strictly liable in products liability cases. Certainly, a landlord is in a similar position to a seller, in that he has superior knowledge and is in a better position to prevent defects and a tenant is in a similar position to a purchaser in that he relies on the skill and implied warranty.
Secondly, products liability was partly based upon the idea that the seller was in a better position to bear and distribute the loss. This is also true of a landlord who can purchase liability insurance and (except possibly for rent controlled apartments) pass the costs on to all of the tenants.
A final reason for imposing strict liability on the sale of products was to eliminate the difficulty of having to prove *751 negligence. Of course, the plaintiff still has to prove a defective condition. The defect may have been created by an affirmative act of the landlord, or a third person, or by the failure of the landlord to discover or repair a defective condition. In any of these cases the lessee is in the same position as a purchaser and it may be impossible to prove that the landlord knew or should have known of the defective condition.
The operator of the rental business must be regarded as possessing expertise with respect to the service life and fitness of vehicles for use. That expertise should put him in a better position to detect or anticipate flaws or defects or fatigue in vehicles. (Cintrone, 45 NJ 434, supra.) Shouldn’t a landlord who overestimates the service life and fitness of various components of apartments bear a similar responsibility? As early as 1941, the Court of Appeals in New York applied the doctrine of res ipsa to a situation where the City of New York laid water pipes under a street and nine years later the pipe burst and the water from the pipe injured property in plaintiff’s store. Although plaintiff did not prove any specific acts of negligence, the court said liability was a jury question. (Foltis, Inc. v City of New York, 287 NY 108.) Strangely enough this theory has never been applied to a landlord-tenant situation. Probably this theory has not been applied because of the unique history of the relationship between landlord and tenant.
In summary, like the typical consumer, the tenant relies upon the landlord’s skill, reputation and implied representation of safety. Builder-vendees of real property, sellers of used property and lessors of personal property have all been held strictly liable.
In Louisiana the landlord is liable for defects existing at the time the lease was made, and even if they have arisen since. (Louisiana Civil Code, art 2695.) "Thus, plaintiff’s right to recover from his lessor and the lessor’s insurer does not depend solely upon fault or negligence * * * This article provides for liability without fault * * * A lessee needs only to show injury from an accident caused by a defect on the premises.” (Joyner v Aetna Cas. & Sur. Co., 240 So 2d 545, 550 [La].)
Taking all of the foregoing arguments into account it seems to this court that the imposition of strict liability on the part of a landlord for injuries caused by a defect in the premises *752 would best serve the interests of justice. He is in a better position to inspect and examine. He is in a better position to know when to repair or replace items. He does make the profit from the venture. He is in a better position to spread the loss. As between a landlord, collecting the rent, and an innocent tenant, the landlord should bear the loss. The development of the tort and lease aspects of our law seem to lead to this conclusion.
Therefore, the motion to amend the complaint to state a cause of action based on strict liability for breach of the implied warranty of habitability is.granted and plaintiff shall serve an amended complaint upon the defendant and file it with the clerk within 10 days of the order entered herein and defendant shall have 10 days from the date of service of said complaint to serve and file an answer.