JEANETTE SIMON, executrix, *vs.* CELESTE SOLOMON.

Suffolk. September 18, 1981. — January 18, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Emotional Distress. Landlord and Tenant*, Habitability, State Sanitary
Code, Quiet enjoyment. *Statute*, Construction. *Due Process of Law*,
Public welfare offense. *Evidence*, Expert opinion, Collateral matter.
*Damages*, For emotional distress, Breach of implied warranty of hab-
itability, Breach of convenant of quiet enjoyment, Attorney's fees.

On a claim by a tenant seeking to recover damages from her former land-
lord for reckless infliction of emotional distress, the evidence warranted
findings that the landlord had recklessly failed to make repairs neces-
sary to prevent repeated flooding of the tenant's apartment, that its
long and repetitious course of conduct toward the tenant was outra-
geous, and that the landlord's conduct was the proximate cause of the
tenant's severe emotional distress. [97-98]
A tenant may properly bring a civil action against a landlord to recover
damages under G. L. c. 186, § 14, for interference with quiet enjoy-
ment of residential premises without first seeking criminal charges
against the landlord under that statute's criminal provisions. [100]
Malicious intent is not a condition of liability under G. L. c. 186, § 14,
which prohibits a landlord's interference with a tenant's quiet enjoy-
ment of residential premises, and a landlord's reckless conduct was
within the scope of § 14. [101-103]
Where a landlord, by failing to prevent repeated flooding, interfered with
a tenant's quiet enjoyment of her apartment, it was liable to the tenant
under G. L. c. 186, § 14. [103]
A statement by a psychiatrist, in the course of his testimony as to the cause
of a tenant's emotional distress, that the tenant "appeared sincere and
honest," was admissible, in the discretion of the judge, as an explana-
tion of the basis of his opinion. [105-106]
At the trial of a claim by a tenant against her former landlord for injuries
caused by unsanitary conditions in her apartment, no error appeared
in the admission in evidence of two tenant complaint slips prepared
after commencement of the action, dated several months after the ten-
ant had moved out of her apartment and taken from the landlord's
telephone records, for the limited purpose of showing that the land-
lord's maintenance supervisor had notice of a flood, and thereby im-
peaching his testimony on cross-examination. [107]

An award of damages against a landlord under G. L. c. 186, § 14, for interference with a tenant's quiet enjoyment of residential premises could not stand where it necessarily duplicated amounts of actual damages recovered by the tenant for breach of the landlord's implied warranty of habitability and for infliction of emotional distress. [107-109]

A tenant proceeding under G. L. c. 186, § 14, for interference with quiet enjoyment of residential premises may recover from his landlord one award equal to three months' rent covering all claims that the tenant raised or reasonably could have raised in the suit or, alternatively, may recover his actual damages if they exceed this amount. [109-111]

Under G. L. c. 186, § 14, allowing a tenant to recover actual and consequential damages from a landlord who has interfered with her quiet enjoyment of residential premises, a judge properly considered legal services related to the tenant's claim for emotional distress in his assessment of attorneys' fees against the landlord, where not only were the tenant's injuries foreseeable, but also the jury found specifically that the landlord knew or should have known that if it permitted floods to occur, the tenant would suffer emotional harm. [111-113]

An award of attorneys' fees under G. L. c. 186, § 14, in favor of a tenant following litigation against her former landlord was, in the circumstances, neither excessive nor unreasonable. [113]

CIVIL ACTION commenced in the Municipal Court of the Roxbury District on December 29, 1976.

Upon transfer to the Housing Court of the City of Boston, the case was tried before *King*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Robert Snider* for Jeanette Simon, executrix.

*Richard W. Cole* (*James H. Wexler* with him) for Celeste Solomon.

HENNESSEY, C.J. In this appeal, a landlord challenges a judgment entered after trial to a jury in the Housing Court Department of the Trial Court, awarding damages and attorneys' fees to a tenant for injuries caused by unsanitary conditions in her apartment.

Gem Realty Company (Gem)[1] managed a large number of apartment buildings in Boston. It rented many of its

---

[1] The company was controlled by Maurice Simon, since deceased, who was the original plaintiff in this action. For purposes of brevity, we refer

apartments to low income tenants under a Federal rent supplement program. From December, 1973, to November, 1977, Celeste Solomon and her two young sons lived in the basement apartment of a building managed by Gem. In December, 1976, Gem began summary process proceedings to evict Solomon for nonpayment of rent. Solomon, citing floods, trash, rats, roaches, and more, denied that she owed rent. She also filed a counterclaim in four counts, claiming that Gem had (1) broken its implied warranty of habitability; (2) violated its implied covenant of quiet enjoyment; (3) caused Solomon emotional distress through its negligent failure to maintain her apartment; and (4) intentionally inflicted emotional distress.

Solomon's counterclaims are based primarily on her allegations of flooding in her apartment. She testified at trial that water and sewage, flowing from an adjoining basement area, flooded her apartment approximately thirty times during her tenancy. Solomon could not recall the date of any of the floods, but was able to name the months in which floods had occurred. She testified that each flood had occurred between twelve and two o'clock in the morning; she described stepping from bed into ankle deep water and slime. Each time this happened, Solomon would spend the night in her kitchen, drinking coffee, and waiting for the morning to call Gem. According to Solomon, a Gem cleanup crew would arrive several hours after her call to pump the water from her apartment. Solomon's testimony concerning the flooding was corroborated by photographs showing water damage, and by witnesses who had seen water or evidence of water in Solomon's apartment.

Solomon did not suffer bodily injury as a result of the flooding. She testified, however, that the floods caused her great emotional anguish. The recurrent water and sewage left her "withdrawn," "depressed," and "ashamed," unable to work or to care for her children. She began to spend much

---

to the owner-landlord as Gem. No question is raised as to Gem's control of the premises.

of her time in a darkened bedroom, crying, and on two occasions she sent her children to stay with relatives, so that they might escape the conditions in her apartment. Two psychiatric experts testified that Solomon had suffered serious emotional injury as a result of her living conditions, and was in need of substantial psychiatric treatment.

Gem admits that water entered Solomon's apartment on several occasions, but denies that thirty "floods" occurred. At trial, Gem's employees described in detail Gem's maintenance procedures and its answering service for tenants' complaints, and testified that they had no memory or record of repeated reports of flooding in Solomon's apartment. Gem also gave evidence concerning the structure of Solomon's building and the possible cause of flooding, and argued that third persons were responsible for any floods that occurred.

The judge granted summary judgment for Gem on Solomon's count for negligent maintenance, reasoning that a claim of negligence could not support recovery for purely emotional harm unaccompanied by physical injuries. The judge submitted the remaining three counts to the jury.[2] The jury returned verdicts for Solomon on each count, awarding her $35,000 for recklessly inflicted emotional distress, $10,000 for breach of the covenant of quiet enjoyment, and $1,000 for breach of the warranty of habitability. The judge subsequently awarded Solomon counsel fees, as permitted by the "quiet enjoyment" statute, G. L. c. 186, § 14, in an amount of slightly more than $40,000. Gem has appealed the judgments entered on the verdicts and fee award. Solomon asserts that she is entitled to recover the total of the three verdicts, and the counsel fees, and has ap-

---

[2] The jury were asked to return a separate verdict on each count, and to answer ten specific questions. In the answers to these questions, the jury found that Gem had broken its implied warranty of habitability and its implied covenant of quiet enjoyment. They also found that Gem had not intended to cause Solomon emotional distress, but had engaged in outrageous conduct, and had known, or should have known, that this conduct would cause emotional distress. Finally, they found that Gem's conduct caused Solomon's distress, and that her distress was severe.

pealed the summary judgment for Gem on her count for negligently-caused emotional distress.

We affirm the judgments entered for Solomon on her claims for breach of the warranty of habitability, reckless infliction of emotional distress, and attorneys' fees. We also affirm the judgment entered for Gem on Solomon's claim of negligence. We vacate the $10,000 award for interference with quiet enjoyment.

1. *Reckless infliction of emotional distress.* Our decisions in recent years have firmly established that a plaintiff may recover for emotional distress inflicted recklessly or intentionally. *Agis* v. *Howard Johnson Co.*, 371 Mass. 140 (1976). *George* v. *Jordan Marsh Co.*, 359 Mass. 244 (1971). See Restatement (Second) of Torts § 46 (1965). In *Agis,* we listed four elements necessary to a recovery on this theory. The plaintiff must show "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . (2) that the conduct was 'extreme and outrageous' . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was 'severe' . . . ." *Agis, supra* at 144-145. If each of these elements is proven, the plaintiff can recover for purely emotional suffering unaccompanied by physical injury. *Id.*

Gem does not seriously challenge the finding of the jury that Solomon suffered severe emotional distress as a result of the floods in her apartment. Instead, Gem stresses that Solomon did not identify a specific "defect" in the apartment building that Gem, as landlord, should have repaired. On this basis Gem argues that it did not act recklessly, did not engage in outrageous conduct, and did not cause Solomon's floods.

The central thrust of Gem's contentions appears to be that its conduct was not the proximate cause of Solomon's injuries — that it was not legally responsible for her misfortune. As Gem points out, the source of the floods was not clear. The water appears to have entered Solomon's apart-

ment primarily from an adjoining basement area. Two waste stacks, admittedly very old, extended from roof to basement collecting waste from the bathrooms, and on occasion may have backed up through a drain in the basement. Gem's plumber, however, testified that the plumbing system and stacks were in good repair and complied with State plumbing regulations. He also stated that backups in the waste stacks were probably caused by objects that other tenants had introduced through the toilets or roof vents. On the basis of this uncontroverted testimony, Gem argues that it acted reasonably in its plumbing maintenance and therefore was not responsible for the flooding.

Gem's legal responsibility, however, depends on the duties it owed to Solomon, and Gem's arguments concerning plumbing misstate the scope of a landlord's duty to its tenants. We have held that every landlord that rents residential property warrants to its tenants that the premises will be delivered and maintained in a habitable condition. *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184 (1973). At a minimum, this warranty imposes on the landlord a duty to keep the dwelling in conformity with the State Sanitary Code. *Id.* at 200 n.16. *Crowell* v. *McCaffrey*, 377 Mass. 443, 451 (1979). See also *Hemingway, supra* at 215-219 (Quirico, J., concurring in part and dissenting in part). A landlord's breach of this duty abates the tenant's obligation to pay rent, even when the landlord is not at fault and has no reasonable opportunity to make repairs. *Berman & Sons* v. *Jefferson*, 379 Mass. 196 (1979). Further, a landlord that fails to maintain a habitable dwelling for its tenant is liable for resulting personal injuries, at least when the landlord has failed to exercise reasonable care in maintenance. *Crowell, supra* at 450-451.

There was evidence at trial that the wall between Solomon's apartment and the adjoining basement area was extremely porous. There was also testimony suggesting that Gem may have considered cementing the wall to prevent floods, but never carried out this plan. The jury could reasonably conclude that Gem's failure to do so caused Solo-

mon's injuries — that but for Gem's inaction, no floods would have occurred.[3] See *Williams* v. *Fontes*, 383 Mass. 95, 97-98 (1981); W. Prosser, Torts § 41, at 237 (4th ed. 1971). Further, a section of the State Sanitary Code (received in evidence), provides that apartments must be watertight. 105 Code Mass. Regs. § 410.000 (1978). In light of our decisions holding landlords responsible for injuries resulting from breaches of sanitary code provisions, Gem's behavior was a sufficiently "proximate" cause to justify the imposition of liability. W. Prosser, *supra* at 244. *Crowell, supra* at 450-452.

Having recognized that an inference was warranted that Gem failed in its duty to prevent the flooding, we find ample evidence in the record from which the jury could conclude that the remaining elements of an action for reckless infliction of emotional distress — recklessness, outrageous conduct, and severe emotional distress[4] — were present. See *Agis* v. *Howard Johnson Co.*, 371 Mass. 140 (1976). Solomon testified that she had repeatedly complained to Gem of floods. She stated that Gem on each occasion sent a cleanup crew to pump out the water, but never took permanent action. The jury, if they believed this testimony, could find that Gem knew or should have known that unless it fixed the porous wall flooding would occur, and that floods of sewage water were very likely to cause emotional harm. See *Agis, supra* at 144-145; Restatement (Second) of Torts § 46, Comment i (1965) (recklessness). The jury could also find that Gem had displayed, over a long and repetitious course, such a pattern of indifference that its conduct was outrageous, "beyond all possible bounds of decency." *Agis, supra* at 145 (quoting from Restatement [Second] of Torts § 46, Commend d [1965]). See *Boyle* v. *Wenk*, 378 Mass. 592, 595-596 (1979).

---

[3] Gem's arguments focus on the causal connection between its conduct and the flooding, rather than that between the flooding and Solomon's injuries.

[4] The severity of Solomon's injury is not an issue on this appeal.

In sum, it could be found that Gem violated its duty to Solomon recklessly, by outrageous omission to act, and thereby caused Solomon severe emotional harm. Therefore, the jury were warranted in holding Gem liable for reckless infliction of emotional distress.

2. *Negligence and strict liability*. Solomon has appealed the summary judgment against her on her count for negligent maintenance. As the trial judge noted in his order, we have not recognized a cause of action for negligently inflicted emotional distress unaccompanied by physical injury. *Dziokonski* v. *Babineau*, 375 Mass. 555, 560 n.6, 561 n.7 (1978). *McDonough* v. *Whalen*, 365 Mass. 506, 517-518 (1974). Cf. *Spade* v. *Lynn & Boston R.R.*, 168 Mass. 285, 290 (1897) (limited on other grounds, *Dziokonski, supra* at 561). See *Ferriter* v. *Daniel O'Connell's Sons*, 381 Mass. 507, 517-518 (1980). Solomon asks us to abandon the requirement of physical injury in actions brought by direct victims of negligence. See *Molien* v. *Kaiser Foundation Hosps.*, 27 Cal. 3d 916, 925-932 (1980); *Rodrigues* v. *State*, 52 Haw. 156, 169-174 (1970). She also suggests that in the landlord-tenant context, proof of negligence should not be necessary. She argues that the warranty of habitability imposes strict liability on landlords for injuries to tenants caused by unsanitary apartment conditions, including emotional injuries. See *Berman & Sons* v. *Jefferson*, 379 Mass. 196, 200-203 & n.9 (1979); *Crowell* v. *McCaffrey*, 377 Mass. 443, 450-451 (1979). Compare *Kaplan* v. *Coulston*, 85 Misc. 2d 745 (N.Y. Civ. Ct. 1976), with *Segal* v. *Justice Court Mut. Hous. Coop.*, 105 Misc. 2d 453 (N.Y. Civ. Ct. 1980). Cf. *Back* v. *Wickes Corp.*, 375 Mass. 633 (1978).

We need not decide whether a tenant could recover for purely emotional harm on a theory of negligence or strict liability, or whether the Legislature intended to authorize such recovery as "consequential" damages under G. L. c. 186, § 14. We have affirmed Solomon's sizeable recovery for reckless infliction of emotional distress, and she has not demonstrated that she would be entitled to additional compensation if permitted to recover under a lesser standard

of fault. It is perhaps conceivable that the verdict for recklessly inflicted emotional distress did not cover all of Solomon's suffering. If the jury based their findings of recklessness and outrageous conduct on the repetitious nature of Gem's conduct, see *Boyle* v. *Wenk*, 378 Mass. 592, 595-596 (1979), they may have calculated damages from a point sometime after Solomon first began to suffer distress. Solomon, however, has not argued this point, and the possibility of a marginally enhanced recovery is too speculative to warrant our reaching beyond the arguments presented.

3. *Liability under G. L. c. 186, § 14.* The judge's award of attorneys' fees, and parts of his instructions on damages, were based on G. L. c. 186, § 14, which imposes civil and criminal liability on a landlord that "willfully or intentionally" fails to provide essential services that it is obligated to furnish, or "directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant." [5]  A

---

[5] In relevant part, G. L. c. 186, § 14, as amended through St. 1974, c. 192, § 1, provides that:

"Any lessor or landlord of any building or part thereof occupied for dwelling purposes, other than, a room or rooms in a hotel, but including a mobile home or land therefor, who is required by law or by the express or implied terms of any contract or lease or tenancy at will to furnish water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or refrigeration service to any occupant of such building or part thereof, who willfully or intentionally fails to furnish such water, hot water, heat, light, power, gas, elevator service, telephone service, janitor service or refrigeration service at any time when the same is necessary to the proper or customary use of such building or part thereof, or any lessor or landlord who directly or indirectly interferes with the furnishing by another of such utilities or services, or who transfers the responsibility for payment for any utility services to the occupant without his knowledge or consent, or any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant, or who attempts to regain possession of such premises by force without benefit of judicial process, shall be punished by a fine of not less than twenty-five dollars nor more than three hundred dollars, or by imprisonment for not more than six months. Any person who commits any act in violation of this section shall also be liable for actual and consequential damages or three months' rent, whichever is greater, and the costs of the action, including a reasonable attorney's fee, all of which may be applied in setoff to or in recoupment against any claim for rent owed or owing."

landlord that violates § 14 is subject to a fine or imprisonment, and is liable to its tenants for "actual and consequential damages or three months' rent, whichever is greater," plus costs and attorneys' fees. See *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758 (1979). Gem contends, on several grounds, that § 14 was inapplicable to this case.

First, Gem argues that § 14 does not create an independent civil action — that it cannot be the basis of a civil recovery until the landlord has been convicted under its criminal provisions. We reject Gem's interpretation. The statute states that one who "commits" any of the proscribed acts is civilly liable; it does not require "conviction." Moreover, a requirement of prior criminal conviction would defeat the efficiency of the civil remedy as a means by which tenants can enforce the statute and obtain compensation. This is particularly true in the context of summary eviction proceedings. By the express terms of the statute a tenant may apply its claims under § 14 against a claim for rent by the landlord. If a prior criminal conviction were required, however, tenants would rarely be able to raise such counterclaims in summary eviction proceedings based on nonpayment of rent. A statute should not be read in a manner that defeats its intended utility. See, e.g., *Commonwealth* v. *Lamb*, 365 Mass. 265, 269 (1974); *Hein-Werner Corp.* v. *Jackson Indus., Inc.*, 364 Mass. 523, 527 (1974). We conclude, therefore, that a tenant may bring an action for civil damages under G. L. c. 186, § 14, without first pursuing criminal charges.

Second, Gem contends that § 14 prohibits only intentional conduct by a landlord. As we noted earlier, the jury did not find that Gem intended to harm Solomon. It did find, however, that Gem acted recklessly. With this finding in mind, we consider the purposes, language, and context of § 14.

Section 14 belongs to a body of statutes establishing tenants' remedies against landlords who fail to provide safe and sanitary housing. See, e.g., G. L. c. 111, §§ 127A-127L, c. 186, §§ 14, 15E, 15F, 18, 19; c. 239, § 8A. These stat-

utes are designed to facilitate enforcement of State housing regulations and to provide relief for tenants deprived of decent homes. See *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184, 191-193 (1973). The objectives of these statutes go beyond deterrence of intentional wrongdoing; unsanitary conditions in an apartment cause harm to the occupants whether the landlord has acted intentionally, negligently, or innocently. See G. L. c. 239, § 8A (no requirement that landlord must have reasonable opportunity to repair before tenant may withhold rent); *Berman & Sons* v. *Jefferson*, 379 Mass. 196, 200-204 (1979).

Of course, general statutory objectives do not necessarily justify the broadest reading possible. See *Morissette* v. *United States*, 342 U.S. 246, 259 (1952). The Legislature may have contemplated a balance between tenant protection and the legitimate interests of landlords, and therefore may have intended that some degree of fault or foreseeability should be a prerequisite to liability under § 14.[6] Cf. G. L. c. 186, § 19 (liability for personal injuries, based on failure to make reasonable repairs after written notice from tenant). Our analysis of the language and history of § 14, however, leads us to conclude that malicious intent is not necessary, and that the statute covers, at the least, reckless conduct such as Gem's.

When § 14 was first enacted, both categories of prohibited conduct — failure to provide services and interference with quiet enjoyment — were modified by the words "willfully or intentionally." St. 1927, c. 339, § 1. In 1973, the statute was rewritten. St. 1973, c. 778, § 2. The requirement of intentional conduct was retained for failure to provide essential services, but deleted from the quiet enjoyment clause; landlords were now liable for "directly or indirectly" interfering with tenants' quiet enjoyment of leased premises. One natural inference from this amendment is that the Leg-

---

[6] Section 14 itself permits landlords to provide in lease contracts that they are not liable for conditions resulting from natural causes beyond their control. This provision suggests that liability was not intended to be absolute.

islature meant to abrogate the requirement of specific intent to disturb quiet enjoyment.

The common law background of § 14 also suggests that malicious intent is not a condition of liability. The phrase "quiet enjoyment" is a familiar term in landlord-tenant law, signifying the tenant's right to freedom from serious interferences with his tenancy — acts or omissions that "impair the character and value of the leased premises." *Winchester* v. *O'Brien*, 266 Mass. 33, 36 (1929) (quoting from *Brande* v. *Grace*, 154 Mass. 210, 212 [1891]). See *Blackett* v. *Olanoff*, 371 Mass. 714 (1977). Every tenancy is deemed to entail an implied covenant that the landlord will not disturb this right during the tenancy. *Id*. Although early cases applying the covenant of quiet enjoyment required intent on the part of the landlord, e.g., *Katz* v. *Duffy*, 261 Mass. 149 (1927), more recent decisions have imposed liability whenever the "natural and probable consequence" of a landlord's action was interruption of the tenant's rights. *Westland Hous. Corp.* v. *Scott*, 312 Mass. 375, 381-383 (1942). *Shindler* v. *Milden*, 282 Mass. 32, 33 (1933). See also *Blackett* v. *Olanoff*, 371 Mass. 714, 716 (1977).[7] When the Legislature chose the words "quiet enjoyment" — words that have little inherent meaning but a rich background in decisional law — it must have intended to incorporate these cases into the statute. See *Pineo* v. *White*, 320 Mass. 487, 491 (1946); *Commissioners of Pub. Works* v. *Cities Serv. Oil Co.*, 308 Mass. 349, 360 (1941).

Gem argues that because criminal penalties are possible under § 14, we should read a requirement of intent into the statute despite the contrary suggestions of its language and background. We disagree. Although we have often stated that penal statutes should be strictly construed, *Commonwealth* v. *Clinton*, 374 Mass. 719, 721 (1978), this maxim is a guide for resolving ambiguity, rather than a rigid require-

---

[7] In *Blackett*, a case decided after the enactment of § 14 in its present form, we held that "the landlord's conduct, and not his intentions" determine whether he has violated the implied covenant of quiet enjoyment. 371 Mass. at 714, 716 (1977).

ment that we interpret each statute in the manner most favorable to defendants. *Commonwealth* v. *McMenimon*, 295 Mass. 467, 470 (1936). Nor do we perceive any constitutional difficulty that would call for a narrow construction. Although the requirement of due process places some limits on legislative power to penalize innocent conduct, legislatures generally have broad power to define and limit the mens rea element of criminal offenses. See *Lambert* v. *California*, 355 U.S. 225, 228-230 (1957); *Commonwealth* v. *Buckley*, 354 Mass. 508, 510-512 (1968). See generally *Morissette* v. *United States*, 342 U.S. 246 (1952). In framing statutes that create special duties of care for the protection of public health and safety, legislators may impose even strict criminal liability. *Morissette, supra* at 252-260. *United States* v. *Dotterweich*, 320 U.S. 277, 280-281, 284 (1943). In the present case, we need not extend the scope of § 14 beyond recklessness, and penalties for reckless conduct are well within the constraints of due process. *Commonwealth* v. *Olivo*, 369 Mass. 62, 71 (1975).

As its third objection to Solomon's recovery on her count for interference with quiet enjoyment, Gem asserts that it was wrongly held responsible for the actions of third parties beyond its control. Pointing to its plumber's testimony that waste backups were caused by tenants' using unauthorized washing machines or introducing objects into the waste stacks, and to its unsuccessful attempts to evict tenants for using washing machines in their apartments, Gem argues that it was unable to control the source of the flooding. Cf. *Blackett* v. *Olanoff*, 371 Mass. 714 (1977). This contention echoes Gem's objections to the verdict for reckless infliction of emotional distress, and we reject it for the same reasons. The water in Solomon's apartment was a preventable situation, and one that Gem had a duty to prevent. See 105 Code Mass. Regs. 410.500; *Crowell* v. *McCaffrey*, 377 Mass. 443 (1979); *Boston Hous. Auth.* v. *Hemingway*, 363 Mass. 184 (1973). The jury found in answer to a special question (see note 2, *supra*), that the water interfered with Solomon's quiet enjoyment of her apartment. Therefore, Gem is liable under G. L. c. 186, § 14.

In sum, we hold that a tenant need not seek a criminal conviction before claiming damages under G. L. c. 186, § 14. Nor must the tenant prove that the landlord intended to interfere with the tenant's rights, at least as long as the landlord's conduct was reckless. Finally, Gem is liable to Solomon under § 14 because it violated its underlying duty to maintain sanitary conditions in her apartment, and thereby permitted repeated flooding to occur that interfered with her quiet enjoyment of her apartment.

4. *Evidentiary rulings.* Gem challenges the admission of two items of evidence. First, Gem asserts that the judge improperly allowed an expert witness to give an opinion on Solomon's truthfulness. The witness in question was a psychiatrist who testified, on the basis of an interview with Solomon, that she had suffered serious emotional disturbance as a result of the conditions in her apartment. The judge refused to allow this witness to state directly his opinion on Solomon's truthfulness during the psychiatric interview, but did permit the witness to testify that he ordinarily assessed patients' truthfulness. The judge also permitted Solomon's counsel to ask the witness what factors he had relied on in reaching his conclusion that the floods in Solomon's apartment were the cause of her distress. Immediately after this question, the judge instructed the jury that they alone were responsible for determining the truth of the parties' allegations, and that they should consider the witness's comments on truthfulness only as evidence of the process by which he had formed his opinion and the facts on which he had relied.[8] The witness then answered that he had relied in

---

[8] After Solomon's counsel asked the witness to describe the factors on which he had relied for his conclusions, the trial judge stated that "any statements that the witness testified that he relied upon [are] only being admitted for the purpose of showing the basis of his opinion. . . . In other words, it's simply being admitted to show the information that he had when he formed his opinion. I'm not allowing it to be introduced to show the truth of those facts. The jury will have to make its decision with regard to what facts in the case are true." In his final instructions to the jury, the judge again emphasized that "[t]he jury is the sole judge of the credibility of the witnesses."

part on statements by Solomon concerning conditions in her apartment, and on the fact that she "appeared sincere and honest."

The role of an expert witness is to help the jury understand issues of fact beyond their common experience. Under modern standards, expert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide. *Commonwealth* v. *LaCorte*, 373 Mass. 700, 705 (1977). *Commonwealth* v. *Montmeny*, 360 Mass. 526, 527-528 (1971). See Fed. R. Evid. 704, and Proposed Mass. R. Evid. 704 (July, 1980), which state the rule in very broad terms. An expert may not, however, offer his opinion on issues that the jury are equally competent to assess, such as credibility of witnesses. *Commonwealth* v. *Gardner*, 350 Mass. 664, 665-667 (1966). See *Commonwealth* v. *Montmeny, supra* at 528-529. On such questions, the influence of an expert's opinion may threaten the independence of the jury's decision. *Commonwealth* v. *Gardner, supra* at 667. See McCormick, Evidence § 12, at 27 (2d ed. 1972).

Nevertheless, the psychiatric witness's testimony was admissible as an explanation of the basis of his opinion. An expert witness may state the grounds on which he has relied in forming his opinion, as part of the foundation for his testimony. *Commonwealth* v. *Massachusetts Turnpike Auth.*, 352 Mass. 143, 151 (1967). *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 199 (1956). *Cronin* v. *Fitchburg & Leominster St. Ry.*, 181 Mass. 202, 203-204 (1902). Such an explanation may be of great use to the jury in determining what weight to accord the expert's testimony. In the present case, for example, the jury might have discredited the witness's testimony if they had concluded from their own observations that Solomon was not sincere. An expert's testimony explaining the foundation for his opinion should not, of course, serve as a channel for the introduction of unnecessary and prejudicial evidence. See *Hunt* v. *Boston*, 152 Mass. 168, 171 (1890). In the pres-

ent case, however, the judge's warnings that the jury should determine for themselves the credibility of witnesses, and should consider the expert's comments on sincerity only as explanations of the basis of his opinion, directly addressed the dangers that would have accompanied an unqualified expert opinion on credibility. See McCormick, Evidence § 12, at 27 (2d ed. 1972). We conclude that when, as here, an expert's statements concerning matters on which he has relied are admitted for the limited purpose of laying the foundation for his opinion and are presented to the jury in a manner that avoids prejudice to the opposing party, the trial judge's discretion should not be disturbed. See *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Auth.*, 335 Mass. 189, 199 (1956).[9] See also Fed. R. Evid. 703; Proposed Mass. R. Evid. 703 (July, 1980).

Gem's second argument respecting evidence is that the judge should not have admitted two tenant complaint slips taken from Gem's telephone records. The slips were dated January 26, 1978 — several months after Solomon had moved out of her apartment. They showed that the new tenant had called Gem to complain that the ceilings were leaking and the "bedroom, living room and hall" were "flooded." The judge admitted these complaint slips for the limited purpose of showing that Gem's maintenance supervisor had notice of a "flood," and thereby impeaching his testimony on cross-examination that the only subsequent tenant complaint had involved "seepage through the bedroom window."[10]

---

[9] Gem also objects that the witness should not have referred to flooding and other conditions in Solomon's apartment except in response to hypothetical questions referring to specific evidence admitted in court. See *Commonwealth* v. *Russ*, 232 Mass. 58, 72-74 (1919). Gem's counsel, however, did not raise an objection to form at the time the witness was asked for his opinion on the cause of Solomon's injuries and for the basis of his opinion. Therefore, Gem cannot pursue the issue now. See *Douglas* v. *Holyoke Mach. Co.*, 233 Mass. 573, 575 (1919); P.J. Liacos, Massachusetts Evidence, 74-75 (5th ed. 1981).

[10] The judge instructed the jury that the evidence was "not being admitted for the truth of what is on those two telephone records but simply to establish that Gem Realty had notice of the complaints, and it's being of-

Gem argues that Solomon could not properly introduce extrinsic evidence to impeach testimony on "collateral" matters. The trial judge, however, might reasonably have determined that Gem's knowledge of complaints received from the tenant who succeeded Solomon, and the maintenance supervisor's truthfulness concerning tenant complaints, were not collateral to the issues at trial. See 3A J. Wigmore, Evidence §§ 1003-1004 (Chadbourn rev. 1970). In any event, a judge, in his discretion, may permit impeachment by extrinsic evidence even on collateral points. *Commonwealth* v. *Clifford,* 374 Mass. 293, 300 (1978). *Lizotte* v. *Warren,* 302 Mass. 217, 218 (1939). In the present case, we find no abuse of discretion; the evidence was not likely to delay the trial or confuse the jury, and there was no unfair surprise to Gem in the use of its own telephone records, other parts of which had already been introduced. Cf. McCormick, Evidence § 47, at 98 (2d ed. 1972); 3A J. Wigmore, *supra* §§ 1001-1002. We conclude that there was no error in the admission of the complaint slips, accompanied by the judge's careful, limiting instruction.

5. *Damages.* Gem objects to the judge's extensive instructions on damages, arguing that the judge misstated the damages authorized by G. L. c. 186, § 14, and incorrectly permitted the jury to assess redundant damages. Gem did not press these objections after the charge was delivered and before the jury retired, and therefore cannot claim appellate relief on the basis of defects in the instructions. Mass. R. Civ. P. 51 (b), 365 Mass. 816 (1974). In this circumstance, we would not disturb the verdicts if, by any line of reasoning, the jury might have made a correct assessment of damages. Cf. *Donahue* v. *Dal, Inc.,* 314 Mass. 460, 462 (1943). However, Gem did file seasonable motions for directed

fered . . . for whatever value it has to discredit the testimony of Mr. Patterson who testified concerning his recollection of complaints received." The slips were recorded after this suit commenced, and therefore were not admissible for their truth under the "business records" exception to the hearsay rule. G. L. c. 233, § 78.

verdicts and for judgment notwithstanding the verdicts. Mass. R. Civ. P. 50(a) (b), 365 Mass. 814 (1974). Based upon these motions, we think that Gem is entitled to a limited review, confined to the question whether the verdicts were supportable under any view of the case as submitted to the jury. Applying this standard of decision, we have considered the evidence presented, the jury's findings, and the judge's instructions, and we conclude that the $10,000 verdict for interference with quiet enjoyment was, inescapably, an award of redundant damages. Therefore, we vacate the judgment on that award. We affirm the remaining awards for breach of warranty of habitability and infliction of emotional distress.

We observe at the outset that much of the confusion that has arisen on the question of damages is attributable to the form in which the case was submitted to the jury. The jury were asked to return separate verdicts on the three counts of Solomon's claim, and responded by awarding $1,000 for breach of warranty, $10,000 for interference with quiet enjoyment, and $35,000 for infliction of emotional distress. Despite their tripartite form, however, these verdicts represent an assessment of the monetary consequences of a single problem — the flooding in Solomon's apartment.[11] In our analysis, therefore, we shall take an overview of the claims and corresponding damages, and avoid the misleading influence of the division of verdicts.

In his instructions to the jury, the judge outlined the damages available under each of the three theories of recovery advanced by Solomon. For interference with quiet enjoyment, he instructed the jury to award the statutory measure

---

[11] Solomon testified to other conditions, unrelated to the flooding, that might have supported a warranty claim or a quiet enjoyment claim. It is clear, however, that each of Solomon's counts was based primarily on the flooding; the other possible violations played no part in her closing argument, and the trial judge stated in his instructions that all three claims arose from Solomon's allegations of floods. In any event, as the following discussion will show, we have taken into account the evidence of secondary violations in our analysis of the damages Solomon received.

of damages under G. L. c. 186, § 14: actual and consequential damages, or three months' rent, whichever is greater. Actual and consequential damages, he explained, included rent paid in excess of the apartment's value, income lost as a result of injury, and "any damage resulting from emotional distress." For breach of the warranty of habitability, the judge instructed the jury to calculate the difference between rent paid and the value of the apartment in its defective condition. Finally, he described the elements of damage for reckless infliction of emotional distress as lost income, medical and psychiatric expense, and past, present and future pain and suffering.

In light of these instructions, the verdict for interference with quiet enjoyment, if based on Solomon's actual damages, necessarily duplicated both the lost rental value awarded for breach of warranty, and the items of damage awarded for infliction of emotional distress.[12] Nor can the verdict be justified on the basis of the alternative measure of damages under § 14 — three months' rent. Triple rent damages, as the judge correctly instructed the jury, are appropriate only when they exceed actual and consequential damages. G. L. c. 186, § 14. *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758, 762 (1979). The jury's $35,000 verdict for emotional distress — an item of "actual damage" under the judge's instructions — demonstrates that Solomon's actual damages were greater than three times her rent.

Solomon suggests that the jury might have arrived at the $10,000 verdict for interference with quiet enjoyment by

---

[12] Solomon's counterclaim also alleged that the floods had caused property damage — an item not covered by her recoveries for breach of warranty and infliction of emotional injury. The amount claimed, however, was far less than $10,000, and so it could not have been the basis of the verdict for interference with quiet enjoyment. As a result of our disposition of the case, Solomon's property damage may go uncompensated. Nevertheless, we do not feel that a remand for calculation of this damage is warranted; Solomon, like Gem, failed to point out the problems in the judge's instructions, and must now bear the consequences of the confusion in the damage awards.

assessing three months' rent for each of a number of separate conditions — such as rodents, overflowing toilets, and a collapsed ceiling — that were present in months when no flooding occurred. She explains that three times her monthly rent of $313, assessed for ten violations, would yield a figure of approximately $10,000.[13] Such an award, however, would be inconsistent with the judge's instructions that all of Solomon's claims were based on the flooding, see note 11, *supra*, and we assume, of course, that the jury complied with those instructions. See *Stricker* v. *Scott*, 283 Mass. 12, 14-15 (1933). Further, such an award would be inconsistent with the purpose we attributed to § 14's triple rent clause in *Darmetko, supra*. We held in *Darmetko* that a tenant could not recover three months' rent for each month during which the landlord permitted a violation to continue. We explained that the triple rent clause of § 14 is an incentive to tenants whose actual damages are slight, not intended for repeated use in calculating damages for a continuing wrong. *Darmetko, supra* at 762. The same reasoning applies to discrete violations asserted in a single action. When three months' rent has been assessed for one violation, the incentive function of the triple rent provision is fulfilled. Therefore, we hold that a tenant proceeding under § 14 may collect only one such award, covering all claims that the tenant has raised or reasonably could have raised in the suit. Further, if actual damages arising from a

---

[13] Solomon's rent was paid in part by the Federal government, through a rent subsidy program. Gem asserts that the relevant figure for calculating three months' rent is not the contract rent of $313, but the amount that Solomon paid personally: $73. We disagree. The triple rent clause is not a compensatory provision; it is an alternative to actual damages, designed to deter violations and to encourage tenants to seek relief under § 14. See *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758, 762 (1979). A rule making triple rent damages dependent on the source of rental payments would unnecessarily increase discrepancies in the amounts recovered by different tenants. Low income tenants receiving rent subsidies, who are often the victims of the most flagrant violations, would recover the least damages, and so would have little incentive to sue and to force repairs. Triple rent, therefore, should be three times the contract rent, without regard to contributions from external sources.

single claim or from all claims combined exceed three months' rent, the triple rent measure has no function, and the tenant's remedy is limited to actual damages. See *Darmetko, id.*

The limitation does not, Solomon suggests, immunize a once recalcitrant landlord from liability for future violations. If new violations arise after the initial suit is filed, the tenant may recover triple rent in a new proceeding. Further, if the landlord persists in or repeats the original violation after a final judgment in the tenant's favor, the tenant may repeat his suit and recover a second time.

In sum, taking into account the relationships among the three counts of Solomon's claim, and the instructions that accompanied their submission to the jury, we find no acceptable basis for the verdict awarding $10,000 to Solomon for interference with quiet enjoyment. The jury could only have reached this verdict by duplicating items of damage subsumed in Solomon's recoveries for breach of warranty and emotional injury, or by making unwarranted use of the triple rent clause of § 14. Accordingly, we vacate it.

When the improper $10,000 verdict is removed, no overlap remains in Solomon's damages. The verdict for breach of warranty reflects only lost rental. value, while the verdict for infliction of emotional distress represents only damages for personal injury. Therefore, we affirm the $35,000 and $1,000 verdicts in Solomon's favor.

6. *Attorneys' fees.* After trial, the judge assessed attorneys' fees of slightly more than $40,000 for Solomon, based on the fee provision of G. L. c. 186, § 14. Gem's primary objection to this award is that the judge improperly considered legal services related to Solomon's claim for emotional distress.

A statutory fee award should not cover effort expended on independent claims that happen to be joined with statutory claims in a single proceeding. See *Hanner* v. *Classic Auto Body, Inc.*, 10 Mass. App. Ct. 121, 124 (1980). As we emphasized in our discussion of damages, however, the partition of Solomon's claims was a matter of form only, and

should not affect the rights of the parties. The three verdicts, although rendered separately, represent various elements of damage arising from a single chain of events — the flooding in Solomon's apartment. We believe, for reasons stated below, that all the items of damage that the jury might have included in its verdicts — including emotional injury — are recoverable under § 14. Therefore, we reject Gem's argument that the judge should have limited attorneys' fees to the value of services devoted to the count labeled "quiet enjoyment."

Section 14 provides that tenants may recover "actual and consequential" damages from landlords who have interfered with their quiet enjoyment of leased premises. We have noted that this provision was intended to expand the damages recoverable for breach of the covenant of quiet enjoyment. *Darmetko* v. *Boston Hous. Auth.*, 378 Mass. 758, 761 n.4 (1979).[14] The meanings of "actual damages" and "consequential damages" may vary with context. Compare H.L. Oleck, Damages to Persons and Property § 12 (rev. ed. 1961), with *Ryan* v. *Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977). Compare G. L. c. 106, § 2-715 (2), with *Boylston Hous. Corp.* v. *O'Toole*, 321 Mass. 538, 563 (1947), and *Smethurst* v. *Independent Congregational Church*, 148 Mass. 261, 265 (1889). Generally, "actual damages" are losses flowing directly from a wrongful act. See H.L. Oleck, *supra* § 12. "Consequential damages" cover all losses that are reasonably foreseeable to the actor, even if they do not result inevitably from the act complained of. See *John Hetherington & Sons* v. *William Firth Co.*, 210 Mass. 8, 21 (1911); *Smethurst, supra* at 265; H.L. Oleck, *supra* § 17. For example, consequential damages in an action based on contract or warranty may include personal

---

[14] In the past, the usual measure of damages was loss of rental value, see *Darmetko* v. *Boston Hous. Auth., supra; Charles E. Burt, Inc.* v. *Seven Grand Corp.*, 340 Mass. 124, 130 (1959), although tenants complaining of interference with quiet enjoyment were sometimes permitted to recover additional elements of damages resembling tort recovery. See *Winchester* v. *O'Brien*, 266 Mass. 33, 37-39 (1929).

injuries caused by the breach. G. L. c. 106, § 2-715. *Sullivan* v. *O'Connor*, 363 Mass. 579, 583-589 (1973). The combination in § 14 of both actual and consequential damages, therefore, suggests that the Legislature intended to include all reasonably foreseeable losses — personal as well as economic — within the scope of statutory recovery. In the present case, not only were Solomon's injuries foreseeable, but the jury found specifically that Gem knew or should have known that if it permitted floods to occur, Solomon would suffer emotional harm. Therefore, Solomon's claim for emotional distress was within the scope of § 14, and was properly considered in the determination of attorneys' fees.

We also reject Gem's contention that the fee award was excessive and unreasonable. The judge made detailed findings as to the fee award, following the guidelines we set out in *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979), and *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 629 (1978). He excluded duplicative and unnecessary work, and work spent on Solomon's negligence claim, on which he had directed a verdict for Gem. Judges have broad discretion in awarding fees, and we see no reason to disturb the judge's determination in this case. *Linthicum, supra* at 388. *Heller, supra* at 629-631.

In sum, we affirm the judgments for Solomon for reckless infliction of emotional distress, breach of the warranty of habitability, and attorneys' fees. We also affirm the judgment for Gem on Solomon's claim of negligence and strict liability. Finally, we vacate the $10,000 judgment for Solomon for interference with quiet enjoyment, and direct that judgment should be entered for Gem on that aspect of the case.

*So ordered.*