Merrick, J.
The defendants, Douglas and Ana Pardee (“tenants”), have appealed a judgment against them in this summary process action brought by Sam Nelson (“landlord”). We affirm the judgment.
In 2005, the landlord, a resident of California, purchased a residential condominium, Unit 3B, Old Lucille’s Building, at 56 Narragansett Street, Oak Bluffs, Massachusetts. The building consists of five units — three commercial and two residential. When the landlord bought the unit in 2005, there was a T-shirt shop in the commercial space below it. In August, 2008, ‘Waters of the World,” an interactive aquarium, moved in below Unit 3B.
On December 15, 2008, the tenants signed a one-year lease with the landlord for Unit 3B at a monthly rent of $1,200.00.
Early in November of 2009, the tenants started to notice mold on the windows in their daughter’s room, then in the living room and the kitchen. Finally, on November 22,2009, mold was found on the wall behind their bed and on their belongings under the bed and in the closet, including luggage, clothes, and shoes. It is apparently not in dispute that the mold was caused by moisture from the operation of the aquarium on the first floor. The tenants called Susie Wallo (Wallo”), the rental agent for the unit and unofficial property manager of the unit, about the mold.
When Wallo went to Unit 3B on December 5, 2009 to see the conditions of the unit, the tenants asked her to help find them a place to move to out of concern for the health of their daughter, who had developed a “funny cough.” The tenants moved to a motel for three days, and then to an apartment above the Ritz Café on Circuit Avenue for six months, paying a total of $819.08 for those alternate accommodations. During this time, the tenants’ moldy belongings remained in Unit 3B.
After he heard of the mold problem from Wallo, the landlord hired Nauset Environmental Services, Inc. (“Nauset”) of East Orleans to inspect the unit. On December 11, 2009, Nauset’s president (“Vaughan”) completed the inspection of Unit 3B, and provided the landlord with a written report and recommendations *51 dated December 15, 2009.[3]
The report stated that “[a] successful mold remediation will be indicated by at least a 95+% reduction oí Asp-Pen like spores in the bedrooms or below a 1,000 S/m3, preferably nearer 500 S/m3, as confirmed by post-remediation verification sampling. Only after verification of a successful mold remediation effort of the space and contents should the space be reoccupied" (emphasis in original).
The landlord entered into an agreement with Benabbey, Inc., d/b/a Disaster Specialists (“Disaster Specialists”), on January 20, 2010 for mold remediation work in accordance with the “recommendations” made in the report on Unit 3B provided by Nauset. The contract price was $4,867.16. Disaster Specialists was scheduled to begin work on the unit on March 1, 2010.
The tenants, in the meantime, hired Gordon Mycology Laboratories for their own evaluation of the mold problem. The president of that company, Deborah Gordon (“Gordon”), inspected Unit 3B on December 15,2009. Based on air and surface samples she took, Gordon determined that a remediation plan should include a cleaning of the air ducts, since she thought the HVAC system had been contaminated, as well as the meticulous cleaning of all surfaces, including the attic.
After her December 5 visit to the tenants, Wallo told the landlord that, despite the mold problem, the tenants were interested in extending their lease, which would expire on December 14, 2009. The landlord offered a lease extension, but no new lease was ever entered into. On January 21, 2010, the landlord sent an e-mail to the tenants proposing a renewal of their lease following mold remediation. The e-mail offered a guarantee — “an official binding agreement” — that the tenants “will definitively and irrevocably be renewing [their] lease for [the unit] for the year 2010 immediately following mold remediation and clean-up.” The tenants were to be given a one-month “grace period” to move back into the unit once work was done. If they did not do so, they would waive their “right of exclusivity” on the unit.
In mid-February, 2010, the landlord, from California, e-mailed and made several attempts to telephone the tenants about execution of the agreement regarding renewal of the lease and a proposed “hold harmless” agreement for the remediation work. The agreement giving the tenants the right to renew the lease for a year if they moved in within a month after the remediation was executed, but the tenants declined to enter into the “hold harmless” agreement.
Meanwhile, the landlord received a letter dated February 12, 2010 from Shirley Fauteux (“Fauteux”), health agent for Oak Bluffs. The letter reflected the conclusion of the board of health that as owner-landlord of the unit, the landlord was responsible for the cleanup. He was given two weeks from receipt of the letter to hire a company to perform the remediation. Fauteux also stated that after remediation, the landlord should contact the Oak Bluffs board of health for a reinspection to confirm compliance. Notices were apparently also given to the Old Lucille’s Condo Association and the Waters of the World aquarium requiring corrective action by them.
*52 During the weekend of February 27-28,2010, Disaster Specialists advised the tenants that it would begin remediation work on March 1. The tenants contacted Disaster Specialists and notified it that their belongings were still in the unit, warned Disaster Specialists not to “touch his [Douglas Pardee’s] stuff,” and threatened legal action if such touching occurred. Tenant Douglas Pardee called again the next day (March 1) and told Disaster Specialists, according to his testimony, “to just go ahead and do it and forget about my stuff ‘cause I didn’t want to be responsible for holding them up.”
On March 2, 2010, Disaster Specialists commenced a three-day remediation of Unit 3B, which ended on March 4, 2010. On March 23, 2010, the landlord wrote to the tenants, noting that the lease between them had expired “at the end of 2009,” that they had made other living arrangements, and that he himself was returning from California and would no longer be renting the unit. The landlord gave “a formal notice of the termination” of any at-will tenancy effective April 30, 2010, and requested that the tenants remove their property (the moldy clothes, furniture, and other belongings) by April 30. The tenants received the letter on March 31,2010.
Two inspections of the property occurred in April, 2010. First, on April 14, 2010, Gordon reevaluated the unit on behalf of the tenants. She said the unit was in much the same condition as it had been in December. Air and surface samples showed similar results as when they were done in December. In her opinion, the work of Disaster Specialists was unsuccessful. Gordon did take note that many of the personal property items that she had observed with mold residue in December were still in the unit. As part of any effective remediation effort, she said, furnishings that carry mold should be thoroughly cleaned or discarded. Gordon said it is possible for such personal property items to affect mold levels in the unit since they still harbored mold spores. Gordon’s report was not written until April 30, 2010.
On April 22,2010, on behalf of the town of Oak Bluffs, health agent Fauteux wrote to the Old Lucille’s Condo Association, the Waters of the World aquarium on the first floor, and the landlord reporting that she had reinspected the property and that the mold conditions and its causes had been corrected in the common areas, the aquarium, and Unit 3B. With specific reference to Unit 3B, she told the landlord that there was no mold present in the unit and that what “may look like mold around the window sills [was], in [her] opinion ... the staining of what was left after the cleaning of the mold.” Fauteux concluded that “all the mold had been removed.”
In the middle of April, 2010, the tenants changed the locks on the door. They never gave a copy of the key to the landlord or Wallo until just before the trial of this summary process action.
The landlord wrote to the tenants on May 4, 2010 complaining that they had not only failed to remove their property, but had also changed the locks. The landlord received no response. The landlord went to Martha’s Vineyard in June, 2010, but was unable to gain entry to Unit 3B because he had no key. Instead, he rented a place in Vineyard Haven for nearly three months.
On June 8, 2010, the tenants moved to Lewiston, New York, but retained the keys to Unit 3B. On August 30, 2010, the landlord commenced this summary process action, seeking possession and $10,800.00 in rent or use and occupancy. The tenants counterclaimed in two counts for breach of the warranty of habitability and breach of the covenant of quiet enjoyment.
*53 The case was tried over three days commencing November 15,2010. The tenants turned over a set of keys to Unit 3B around November 1, 2010, shortly before the trial. However, the tenants did not turn over possession of the unit until January 11, 2011, after the trial and before the court’s decision, when the tenants and the landlord entered into an agreement in which the tenants gave up possession of the unit.
In his final decision, possession by then being moot, the trial judge found for the landlord on the tenants’ counterclaim for breach of the covenant of quiet enjoyment, concluding that the landlord did not negligently act or fail to act so as to cause the mold condition or permit it to continue. On the tenants’ defense and counterclaim of breach of the warranty of habitability, the trial judge found a breach of the warranty because of the mold condition and abated the rent due in its entirety through April 30, 2010. The judge awarded additional damages for the breach of the warranty of habitability of $5,000.00 for Ana Pardee’s emotional distress and the alternate housing expenses of $819.08. He made no award for the tenants’ personal property.
On the landlord’s claim for rent or use and occupancy, the judge, as we have noted, abated the rent in its entirety through April 30, 2010, but awarded use and occupancy in the amount of $8,840.00 thereafter through January 11, 2011. There was a net judgment for the landlord against the tenants in the amount of $3,020.92.[4] The tenants filed this appeal.
The tenants’ notice of appeal stated ten grounds of appeal. We confine our review, pursuant to Dist./Mun. Cts. R. A. D. A, Rule 16(a) (4), to the following issues listed in the “Statement of the Issues Presented for Review” and argued in their brief:
A. Whether the trial court’s failure to make findings of fact with respect to the condition of the apartment after it was inspected by the Board of Health and Gordon Mycology in April 2010 was an abuse of discretion?
B. Whether it was clearly erroneous for the trial court to fail to conclude that the warranty of habitability was breached between April 2010 and January 2011?
C. Whether the trial court’s determination that the landlord was not negligent and consequently did not violate the covenant of quiet enjoyment was clearly erroneous?
*54 1. The first two issues in the tenants’ statement of issues question whether the failure to make findings on the condition of Unit 3B after April 30 was an abuse of discretion and whether the failure to find a breach of the warranty of habitability after April 30 was “clearly erroneous.” The seriousness of the claimed defects is only one of a list of factors (not necessarily all inclusive) bearing on the existence of a material breach of the warranty of habitability. Boston Hous. Auth. v. Hemingway, 363 Mass. 184, 200-201 (1973). “Factors ... aiding the court’s determination of the materiality of an alleged breach of the implied warranty of habitability include... whether the defects resulted from abnormal conduct or use by the tenant.” Id. While the tenants certainly did not cause the original mold condition, the judge found that they had denied access to the apartment from April, 2010 forward by changing the locks and withholding the keys. The judge also found that they had failed to remove or clean their moldy personal property that remained in Unit 3B. In a remarkable display of effrontery, the tenants complain that the judge did not make findings of fact as to the condition of the unit during the time after the tenants, having left their moldy personal property in the apartment and changed the locks, denied access to everyone else. “A landlord may dispute liability for damages based on a claim that a tenant has not allowed access to the premises for the purpose of making repairs.” W.E. HARTWELL, RESIDENTIAL LANDLORD-TENANT BENCHBOOK, at 64 (Flaschner Jud. Inst. 2005). See Katz v. Okere, No. 00-P-681 (Mass. App. Ct., March 29, 2002) (unpublished Rule 1:28 decision) (warranty of habitability not breached due to “tenants’ arbitrary denial of access to the apartment”). See also Kol v. Joshi, 439 Mass. 1004, 1005 (2003) (issue was moot). The judge’s determination that there was no breach by the landlord of the warranty of habitability after April 30 was based not upon the condition of the unit, but on the tenants’ conduct in denying access to the property after April 30,2010. In the absence of a finding of a breach of warranty of habitability after April 30, 2010, the judge properly awarded use and occupancy damages to the landlord for the tenants’ continued retention of possession after that date. Bruce v. Harvard Trust Co., 1 Mass. App. Ct. 373, 374-375 (1973).
2. The last item of the tenants’ “Statement of Issues Presented for Review” is an argument that the trial judge’s failure to find that the landlord acted negligently (and consequently in violation of the covenant of quiet enjoyment) was “clearly erroneous.” The burden of proof of negligence and of a consequent violation of the covenant of quiet enjoyment was upon the tenants. The landlord owned a single apartment unit in a building and above an aquarium, neither of which were under his control. When a condition of mold arose, not caused by the landlord, he acted promptly to investigate and hire Disaster Specialists to remediate. There was some delay between the hiring of Disaster Specialists and its commencement of work, but nothing in the record attributes that delay to negligence of the landlord or, for that matter, Disaster Specialists. Following the work, the property was inspected by the town health department, which had required it, and was pronounced suitable for occupancy. The judge found that the landlord was not negligent in relying upon the inspection by the town. The conflicting inspection report by Gorman, the tenants’ expert, was not written until April 30, 2010, by which time the tenants had, as the judge found, “taken the dramatic and improper step of changing the locks to the unit in April, 2010, thereby preventing access by [the landlord] to the unit.”
In the face of all this, perhaps the judge could still have found that there was a *55 breach of the covenant of quiet enjoyment caused by negligence of the landlord, but it certainly cannot be said to have been “clearly erroneous” that he did not so find.
Nor was the judge required to find that Disaster Specialists was negligent in its remediation work, as alleged by the tenants’ expert, in violation of a nondelegable duty of the landlord to remediate. The judge was not required to choose between that evidence and the inspection by the town to determine the condition of the property postremediation (again, especially where the tenants had denied all access to the property). As the judge was not persuaded either way by the evidence, the parties with the burden of proof, the tenants, fail on that argument.
The judge properly declined to find a breach of the covenant of quiet enjoyment occasioned by any negligence of the landlord.
Judgment affirmed.
So ordered.

 fThe “Nauset” report was entered into evidence only on the limited issue of notice to the landlord of the scope of remediation work recommended by Nauset, not for the truth of its contents.

 As the judge found a breach of the warranty of habitability from December, 2009 through April, 2010, he properly abated the rent during that time, even though, as we discuss in more detail below, he found no negligence on the part of the landlord. “A landlord’s breach of this duty [the warranty of habitability] abates the tenant’s obligation to pay rent, even when the landlord is not at fault and has no reasonable opportunity to make repairs. Further, a landlord that fails to maintain a habitable dwelling for its tenant is liable for resulting personal injuries, at least when the landlord has failed to exercise reasonable care in maintenance” (citation omitted). Simon v. Solomon, 385 Mass. 91, 96 (1982). There is certainly a question of whether personal injury damages arising out of an alleged breach of the warranty of habitability, such as the tenants’ emotional distress claim, are recoverable at all in the absence of negligence. Scott v. Garfield, 454 Mass. 790, 7ff