NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-209                                        Appeals Court

   SOUTH BOSTON ELDERLY RESIDENCES, INC.  vs.  GERALD MOYNAHAN.


No. 16-P-209.

        Suffolk.     December 1, 2016. - May 9, 2017.

          Present:  Milkey, Massing, & Sacks, JJ.


Housing.  Summary Process.  Landlord and Tenant, Eviction, Rent,
     Repairs, Habitability, Reprisal against tenant, Consumer
     protection, Quiet enjoyment.  Practice, Civil, Summary
     process, Abatement, Damages.  Damages, Breach of implied
     warranty of habitability.


        Summary Process.  Complaint filed in the Boston Division of
the Housing Court Department on February 4, 2013.

        The case was heard by Jeffrey M. Winik, J.


        A. Joseph Ross (Ellen Rappaport-Tanowitz also present) for
the tenant.
        W. Paul Needham for the landlord.


        MILKEY, J.  The defendant, Gerald Moynahan, rents a small

apartment from the plaintiff, South Boston Elderly Residences,

Inc. (landlord).  In this summary process action, Moynahan

retained possession, which is no longer at issue.  The remaining

disputes concern his counterclaims. A Housing Court judge found that the landlord committed a breach of the warranty of habitability with respect to two different problems with the apartment. One was a recurring moisture problem that became so bad at one point that mushrooms were growing in the carpeting. The other was the lack of ventilation due to inaccessible windows. However, for various reasons that the judge explained in a detailed memorandum of decision, Moynahan received only minor rent abatement damages, and his claim brought pursuant to G. L. c. 93A was dismissed. The judge also concluded that the landlord had presented clear and convincing evidence to overcome the statutory presumption that its efforts to evict Moynahan were in retaliation for his reporting the sanitary code violations at the apartment. We affirm in part, reverse in part, and remand for additional proceedings.

Background. In November, 2007, Moynahan moved into unit 13 of an elderly housing complex that the landlord owns in the South Boston neighborhood of Boston. The building had just been renovated, and Moynahan was the first tenant to move into unit 13 after the renovation. This ground-floor apartment totals approximately 453 square feet in size. Because of the sloping topography of the site, part of the unit is subterranean. Unit 13 has long suffered from moisture and related mold problems. The specific progression of these problems is important to

resolving this case, and we therefore turn to reviewing that history in some detail.

1. The moisture problems. As the landlord admitted at trial, moisture issues in unit 13 predated Moynahan's tenancy. Specifically, one of the landlord's property management agents testified that even before Moynahan moved in, "the unit had water issues." According to Moynahan's testimony, unit 13 was "extremely damp" during the summer of 2008, and he discovered "mold, mildew, something of that sort" growing in his bedroom closet. As was documented in electronic mail (e-mail) exchanges admitted in evidence, Moynahan had reported the mold and dampness issues to the landlord by December of 2008 at the latest. For example, a December 23, 2008, e-mail message related that there was "something black growing on one interior wall," and noted "the peculiar cat-like odor originating" from that area.[1] A follow-up letter that Moynahan sent on December

---

[1] It bears noting that Moynahan originally reported the moisture issues in the context of his trying to move to a different apartment in the same building that he found "so much larger and brighter." After he was told by the landlord that such moves generally were prohibited, he offered the moisture problems in unit 13 as a potential ground for making an exception to the policy. In response to the property manager's leaving a message that she was sorry he was unhappy with his apartment, Moynahan emphasized that he was not unhappy with it, and he downplayed the impact of the moisture issues on him. Specifically, he characterized "the cat-like odor" as "rather unpleasant, but tolerable," and "the mold-or-mildew" as not being "any real problem," or "anything I would be concerned about and most certainly not anything I would complain about."

29, 2008, complained again in detail about "the mold and the cat-like odor," and it relayed Moynahan's belief that "the mold may also be the cause of chronic bronchial congestion that I have in the morning and that I never, in sixty-eight years, previously had." After inspecting unit 13, the landlord confirmed that "[t]he carpet was damp," "fixed the air conditioner" (which was believed to be the source of the problem), and "dried out the rug."

Moynahan did not report any mold problem again until March 17, 2010, when -- as is uncontested -- he raised it orally during an annual inspection of his apartment. A follow-up inspection was scheduled and, by letter dated March 23, 2010, the landlord notified Moynahan that the "inspection was not able to be completed due to the amount of clutter and debris in [his] home." The letter described a "'sea' of paper bags and boxes," it stated that this clutter violated the lease, and it warned of some of the specific dangers presented, such as a fire hazard. With respect to the alleged mold in his closet, the letter stated that "[t]here is no way any work can be performed in that closet until most if not all clutter/boxes are removed." It also warned of the need to address the mold issues immediately: "This mold can and will spread to the rest of the apartment and we need to address this as soon as possible." Finally, the

letter closed by scheduling a follow-up inspection on April 19, 2010.

Moynahan provided a detailed written response to the landlord's letter. That response described the various items he had stored in the apartment, and it acknowledged that "[c]ertainly in as small a space as this apartment all these result in what could colloquially be called a 'cluttered' space." The letter denied that his storage practices violated the lease and denied that any of the stored items could be described as "debris."

On April 19, 2010, the date of the scheduled follow-up inspection, the landlord never showed, prompting Moynahan to send an angry letter regarding his having wasted the day. In fact, despite the dire tone of the landlord's March 23, 2010, letter with respect to both the clutter and mold issues, there is no evidence that the landlord took any further action for more than a year. The property manager herself described what happened: "I think at that point it kind of fell to the wayside." Moynahan continued to pay his rent.

By August, 2011, the moisture problems had worsened to the point that, as noted, there were mushrooms growing in the carpeting. As occurred in 2008, see note 1, supra, Moynahan raised the moisture problem in unit 13 with the landlord in the context of his seeking to move to a different apartment in the

same building.  In a letter dated August 19, 2011, Moynahan explained that he wanted to move because his existing apartment

> "has for some time now been totally unsuitable for occupancy by any person, and it is becoming steadily and very rapidly more so, owing to extreme dampness and the wetness of the carpeted floor, a large and very rapidly expanding portion of which is, at this writing, soaking wet because of water coming up from below. . . .

> "The identical problem has recurred every summer to some extent, but I have never complained about it because no other unit in this building was then available, and I most certainly did not want to experience what the lady in the immediately adjacent apartment number 11 had experienced when she had insoluble water ingress problems in her apartment:  namely, to be moved to one of your units in Milton."

When Moynahan was not allowed to move to the open apartment, he reported the moisture problem in unit 13 to the Boston inspectional services department (ISD), which cited the landlord for the problem.  According to the judge, by September 9, 2011, a plumber hired by the landlord "repaired the wall-mounted air conditioning unit that appears to have been the source of the water leak."  However, the water had caused extensive damage to the walls and carpeting.  The necessary repairs were delayed by contentious negotiations between the landlord and Moynahan over the terms of Moynahan's vacating the apartment to allow the work to be done.  Moynahan eventually temporarily moved into the adjacent unit 11, and the landlord then addressed the damage caused by the moisture issues, completing those repairs by March 3, 2012.

2. <u>The October, 2011, notice to quit</u>. Meanwhile, on October 6, 2011, the landlord served Moynahan with a notice to quit the premises. At that point, Moynahan still was current in paying his rent, and the notice to quit was based on the cluttered state of Moynahan's apartment. Thereafter, the landlord refused to cash Moynahan's rent checks. Moynahan stopped payment on the accumulated uncashed checks to the landlord, instead paying the rent into an escrow account.[2]

3. <u>The ventilation problem</u>. Moynahan began moving his possessions back into unit 13 in April, 2012. He told the landlord, however, that he could not stay in the unit for extended periods of time due to fumes emanating from the fresh paint and new carpeting. Moynahan pointed out that although the apartment had six windows that theoretically could be opened to ventilate the fumes, these windows were inaccessible because they were eight feet from the floor. In May, 2012, Moynahan contacted ISD about the ventilation issues. The agency concluded that the inadequate ventilation caused by the inaccessible windows constituted a sanitary code violation. After ISD intervened, the landlord addressed the ventilation issue by installing on some of the windows special latches that could be opened using a pole. ISD signed off on this fix in

---

[2] Moynahan did pay his rent to the landlord for two months, March and April, 2012.

December, 2012. In the interim, Moynahan slept at his sister's house.

4. The December, 2012, notice to quit and the court action. Having addressed the ventilation issue, the landlord on December 14, 2012, served Moynahan with a second notice to quit, this one based on the unpaid rent. The current summary process action followed on February 4, 2013. Moynahan brought numerous counterclaims to the summary process action. As the case crystallized over the course of the proceedings, the key issues were the following: the extent to which the moisture and ventilation problems constituted a breach of the warranty of habitability and warranted rent abatement damages; whether the landlord's conduct violated c. 93A or statutes prohibiting retaliation by landlords, see G. L. c. 186, § 18, and G. L. c. 239, § 2A; and whether the landlord's entry into unit 13 at times when Moynahan had signaled he could not be present interfered with his quiet enjoyment of the premises, see G. L. c. 186, § 14.

5. The judge's findings and rulings. Following a three-day trial, the judge issued extensive findings and rulings. The judge found that both the moisture problem and the ventilation problem constituted a breach of the warranty of habitability, but he allowed only limited rent abatement damages during the respective periods. With respect to the moisture problem, the

judge determined that the first material breach of the warranty of habitability occurred in August, 2011, when the existence of a severe moisture problem was well-documented and the landlord plainly had notice of the problem. The judge declined to give Moynahan any rent abatement damages for any moisture problems prior to August, 2011, offering two different types of reasons for this. First, he found that although Moynahan had reported moisture-related problems prior to August, 2011, "those conditions were relatively minor and did not endanger Moynahan's health or safety or otherwise diminish the value of the apartment." Second, with respect to the mold issues reported in March, 2010, the judge found that clutter in the apartment prevented the landlord's inspector from gaining the access necessary to confirm whether the problem existed.

Although the damage caused by the leak was not repaired until March 3, 2012, the judge declined to give Moynahan any rent abatement damages for the months of October, November, and December of 2011, on the grounds that during those months, Moynahan made unreasonable demands and prevented the landlord from making the repairs. The only breach of warranty damages that the judge awarded for the moisture problem were based on a thirty percent rent abatement for August and September of 2011, and a twenty percent abatement for January and February of 2012. These damages equaled one month's rent, $788.

With respect to the ventilation problem, the judge did not award Moynahan any abatement damages for the period prior to May, 2012, that is, before ISD cited the landlord for the violation. For the time period from May to December, 2012, during which Moynahan slept at his sister's residence, the judge awarded Moynahan rent abatement damages of only five percent, for a total of $315.20 over this eight-month period. The judge declined to calculate damages based on a higher abatement percentage because he found that the ventilation problem "had [only] a minor impact on Moyn[a]han's ability to live in the apartment." The judge did "not credit Moynahan's testimony that he had difficulty breathing in his unit," and he found that "[a]ny paint vapor fumes that may have been present in [u]nit 13 would have had a negligible impact on a tenant of average sensibility."[3]

Because the landlord served notices to quit within six months of Moynahan's complaints to ISD about the moisture and ventilation issues, the judge found that Moynahan was entitled to the statutory presumption that the landlord acted in retaliation. See G. L. c. 186, § 18 (creating an affirmative

---

[3] Elsewhere in his lengthy memorandum, the judge repeated his view that Moynahan may have been unduly sensitive to the ventilation issue, finding "no credible evidence that any reduction in the flow of air in [u]nit 13 resulting from the inability to open the windows would have had any significant adverse impact on a tenant of average sensitivity."

action for damages); G. L. c. 239, § 2A (creating a defense to a summary process action). Nevertheless, the judge ruled that the landlord rebutted that presumption by clear and convincing evidence showing "sufficient independent justification for seeking to terminate Moynahan's tenancy": the clutter issues for the first notice to quit and the sustained nonpayment of rent for the second. The judge specifically found that the landlord "would have taken action to terminate Moynahan's tenancy in October 2011 and in December 2012 even if Moynahan hadn't complained about the water leaks in 2011 and the lack of window ventilation in 2012."

With respect to Moynahan's claim brought pursuant to G. L. c. 93A, the judge ruled that the landlord had not committed a breach of that statute because it had acted promptly and reasonably to make repairs once Moynahan brought the problems to its attention (with any delays the fault of Moynahan).

Finally, with respect to Moynahan's claim that the landlord interfered with his quiet enjoyment by entering unit 13 without his permission, the judge found that the landlord entered the apartment without Moynahan present only to address conditions that Moynahan had reported and that this was not a violation because the lease authorized the landlord "to enter the premises

for the purpose of making reasonable inspections and repairs and replacements."[4]

After making findings, the judge afforded Moynahan one week to pay the rent owed (less abatement damages), along with interest and costs of suit.  See G. L. c. 239, § 8A, fifth par. After Moynahan did so, the court entered judgment of possession in his favor.

Discussion.  "On review of a jury-waived proceeding, we accept the judge's findings of fact unless they are clearly erroneous. . . .  We review the judge's rulings on questions of law de novo."  U.S. Bank Natl. Assn. v. Schumacher, 467 Mass. 421, 427 (2014) (citations omitted).  On appeal, Moynahan makes numerous claims of error, which we address in turn.

1.  Breaches of warranty of habitability.  The implied warranty of habitability includes the promise to maintain a rented unit, "[a]t a minimum," in compliance with the State sanitary code.  See Simon v. Solomon, 385 Mass. 91, 96 (1982). Where a tenant has proved a breach of the warranty of habitability, he is entitled to damages that can offset a landlord's claim of unpaid rent.  The tenant remains "liable for

---

[4] Moynahan also unsuccessfully brought counterclaims based on violation of the security deposit statute, infliction of emotional distress, and discrimination.  Because Moynahan raises no claim of error with regard to the judge's dismissal of these counterclaims, we do not address them.  See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

the reasonable value, if any, of his use of the premises for the time he remains in possession." Boston Hous. Authy. v. Hemingway, 363 Mass. 184, 202 (1973). The question is how much the defects reduced the value of the residence. Id. at 203 ("The measure of damages would be the difference between the value of each apartment as warranted and the rental value of each apartment in its defective condition"). Moynahan makes a number of distinct arguments as to why he should have been given a larger rent abatement than he was given with respect to the moisture and ventilation problems.[5]

a. Period for which damages are due. With respect to the moisture problem, Moynahan argues that the judge erred in not abating part of his rent for the period prior to August, 2011. As Moynahan points out, he first notified the landlord that there were problems with mold and dampness in the apartment in December, 2008, and the landlord admitted at trial that "the unit had water issues" prior to Moynahan's tenure there.[6] Similarly, with respect to the ventilation problem, Moynahan argues that the judge erred by abating part of his rent only as

[5] Moynahan has never argued that the moisture and ventilation problems are linked, that is, that the lack of adequate ventilation helped cause or exacerbate the moisture problem. We therefore treat these issues as distinct problems.

[6] It bears noting that a landlord is deemed to have constructive notice of conditions present at the inception of a tenancy without proof of actual notice. McKenna v. Begin, 3 Mass. App. Ct. 168, 173-174 (1975).

of May, 2012, when he claimed that the fumes from the apartment repairs prevented him from staying there.  As he points out, although the lack of ventilation came to the fore at that time, it existed throughout his tenancy.

We are not unsympathetic to Moynahan's arguments.  For example, there was evidence that there may have been significant moisture-related problems in his apartment prior to August, 2011, and that the landlord had notice of these problems.  To the extent that the judge concluded that the mere existence of the clutter issues justified the landlord's failure to follow up on the reported mold issues, we firmly disagree.[7]  See Berman & Sons, Inc. v. Jefferson, 379 Mass. 196, 200 (1979) ("Considerations of fault do not belong in an analysis of warranty").  Moynahan was, by all accounts, prepared to accommodate the landlord's scheduled visit on April 19, 2010, and there is nothing to suggest that on that date clutter would have prevented inspection or repairs.  That Moynahan did not complain again about the landlord's lack of follow-up does not excuse the landlord from ignoring the problem for roughly the next eighteen months.  Once notice of a defect is given, it is

---

[7] Moynahan independently argues that the judge abused his discretion in excluding from evidence a particular photograph that Moynahan proffered (and which he now argues was relevant to whether clutter prevented the landlord from addressing the mold problem).  We pass on that question, because it is of no consequence to our resolution of this case.

not incumbent upon the tenant to remind the landlord that repairs are necessary.  See ibid. (landlord strictly liable for material breach of warranty of habitability upon notification).

Nevertheless, the existence of a code violation by itself does not necessarily entitle a tenant to a finding that a material breach of the warranty of habitability has occurred. McKenna v. Begin, 5 Mass. App. Ct. 304, 308 (1977) (minor code violations, without more, did not entitle the tenant to damages).  When a breach of the warranty of habitability first occurs is a question of fact, and Housing Court judges have significant latitude in resolving such issues.  See Hemingway, supra at 200;  McKenna v. Begin, 3 Mass. App. Ct. 168, 173-174 (1975).  The trial judge specifically found that, prior to August, 2011, the moisture related problems "were relatively minor and did not endanger Moynahan's health or safety or otherwise diminish the value of the apartment."  Similarly, the trial judge found no evidence that the ventilation issue caused Moynahan any appreciable problem prior to May, 2012.  We are bound by such findings unless they are "clearly erroneous." Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).  On the current record, we are unable to say that they were.  See generally Jablonski v. Casey, 64 Mass. App. Ct. 744, 747 (2005) (finding of fact not clearly erroneous unless there is no evidence to support it or "the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been committed"), quoting from United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

b. Delay in repairs. Moynahan additionally argues that the judge erred in not awarding him rent abatement damages for the months of October, November, and December of 2011. Moynahan argues that the judge in effect unfairly placed the blame on him for the three-month delay in making the repairs. As an initial matter, we note that Moynahan's characterization of what the judge did fails to take into account that the judge assessed damages based on a twenty percent abatement for January and February of 2012, even though during that time the landlord had made available to Moynahan the other unit, which raised no habitability concerns.[8] In other words, during this five-month period, Moynahan faced substandard living conditions for only three months (having been provided adequate replacement housing for the other two months), and was awarded abatement damages for two months. In view of this, he can claim that the judge deprived him of only one month of abatement damages. Given that there is substantial support in the record for the judge's finding that Moynahan was responsible for causing at least some

---

[8] The fact that the landlord filed no cross-appeal challenging this aspect of the judge's ruling does not mean that we cannot take it into consideration in evaluating Moynahan's appeal.

of the delay in repairs during the fall of 2011, we discern no error in the judge's award of abatement damages for this period.[9] See generally Brown v. LeClair, 20 Mass. App. Ct. 976, 978 (1985) (recognizing that "damages in rent abatement cases are not capable of precise measurement").

c. Percent reduction for ventilation issues. Moynahan argues that the judge erred in allowing him only a five percent abatement in rent for the period he claimed the fumes in the apartment prevented him from staying there. As noted, the judge allowed Moynahan only that nominal abatement based in part on his finding that any indoor air quality issues were minimal for "a tenant of average sensibility."[10] This implicates the question whether a reduction in value should be measured by the actual impact of the relevant code violation (or condition of disrepair) on the tenant making the claim or instead measured by

_____

[9] We recognize that when a landlord has violated the warranty of habitability, it does not get a grace period from damages for the reasonable time necessary to make repairs. See Berman & Sons, Inc., supra at 199-200. However, we do not view that rule as precluding a trial judge from reducing the abatement damages by an amount that reflects unreasonable delays caused by the tenant.

[10] It is not clear on what evidence the judge based this assessment, although he appears to have found it significant that others did not note or recall a fume problem in unit 13. Moynahan did not argue that he was entitled to a presumption that he was a person of average sensibility, nor did the judge consider that issue. See Payne v. R.H. White Co., 314 Mass. 63, 65-66 (1943) (addressing such a presumption in the context of the implied warranty of merchantability).

some sort of "average sensibility" standard.  This is a question

of law subject to de novo appellate review.

Neither party has brought to our attention, nor have we

found, any appellate case addressing this issue directly.

Reference in at least one case to "the rental value" of the

apartment in its impaired condition could be taken to support

the judge's view that a tenant's damages are to be measured

without attention to his or her particular circumstances.  See,

e.g., Hemingway, 363 Mass. at 203.  However, in that case, none

of the issues touched on a tenant's special sensitivities.

Thus, the court was not faced with whether a test based on

market principles should give way if the presence of a

plaintiff's special circumstances meant that using that

yardstick would not make the injured party whole.  See McKenna,

supra at 309 ("One of the established aims of determining

damages for breach of contract is to put the injured party in

the position he would have been in if performance had been

rendered as promised").[11]  We have addressed that tension in the

analogous context of measuring damages caused by breaches of

purchase and sale contracts.  As we stated in American

---

[11] See generally F. A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 411 (1941) ("A plaintiff in an action for breach of contract is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him and to put him in as good a position financially as he would be in had there been no breach").

Mechanical Corp. v. Union Mach. Co. of Lynn, 21 Mass. App. Ct.

97, 101 (1985):

> "The usual formula for measuring damages for breach of a
> real estate purchase and sale agreement -- the difference
> between the contract price and the market value on the date
> of the breach -- is merely a different formulation of the
> general rule for measuring contract damages. In the usual
> case, the contract price less the market value represents
> the seller's actual loss, and the formula, therefore,
> affords the injured seller an adequate remedy. In some
> cases, however, the actual loss suffered . . . exceeds the
> amount yielded by that formula."

Thus, we have cautioned against strictly applying market-based

tests as a measure of contract damages where doing so would fail

to compensate a plaintiff for his or her injuries.[12]

Of course, the particular circumstances at issue in

American Mechanical Corp., supra at 99-103, involved special

economic circumstances, not, as here, sensitivity to chemical

---

[12] Whether a plaintiff is a person of ordinary sensibilities
has arisen in older cases involving the implied warranty of
merchantability. See, e.g., Payne v. R.H. White Co., supra at
65 (noting, in a case in which the plaintiff had what appears to
have been an allergic reaction to a dress she had bought, that
"[t]he plaintiff must show that the dress was unfit to be worn
by a normal person and cannot recover by merely showing that it
was unfit for her or for some unusually susceptible person to
wear"). However, such cases have addressed that issue as going
to whether there has been a breach of the warranty of
merchantability, not what the measure of damages should be if a
breach of warranty has been shown. Here, the judge found that
the lack of ventilation caused a material breach of the warranty
of habitability (a finding that is not in dispute). Moreover,
the same cases that have recognized an average sensibility
standard in the context of the warranty of merchantability have
also recognized that a plaintiff is entitled to a presumption
that he or she is a person of average sensibility (significantly
reducing the "bite" of such a test). See note 10, supra, citing
id. at 65-66.

exposure.  However, that distinction supports rather than undercuts Moynahan's case.  That is because the implied warranty of habitability sounds in tort as well as contract.  See Scott v. Garfield, 454 Mass. 790, 794 (2009) (visitors who are injured by defect in apartment that violates the implied warranty of habitability may sue based on that breach to recover personal injury damages).  It is a well-established principle of tort law that the defendant must take its plaintiff as it finds him or her.  See Wiemert v. Boston Elevated Ry. Co., 216 Mass. 598, 603 (1914); doCanto v. Ametek, Inc., 367 Mass. 776, 783-784 (1975).

In the case before us, although the judge appears to have concluded that Moynahan may be subject to special sensitivities, he nevertheless found a material breach of the warranty of habitability.  That finding is fully supported given that unit 13 effectively had no ventilation whatsoever until the windows were made accessible.  In the face of that breach, Moynahan could not be made whole unless he was compensated for the difference between the unit's warranted value and its diminished value to him due to the lack of ventilation.  We therefore hold that the judge erred to the extent that he based his calculation of abatement damages on the fact that Moynahan might happen to be more sensitive to the code violation than someone of "average sensibility" (however that is measured).

To be sure, even if the judge had applied the correct standard, he was free to reject Moynahan's claim on the facts presented at trial.  Indeed, the judge declined to credit Moynahan's testimony that the fumes were as bad as he maintained (for example, the judge expressly rejected Moynahan's claim that "he had difficulty breathing").  Because the judge found that the absence of accessible windows caused a material breach of the warranty of habitability and then assessed some abatement damages for the breach, it is plain that the judge did not totally discredit Moynahan's claim that there was an indoor air problem related to the lack of ventilation.  We are unable to discern the extent to which the judge's employment of an incorrect legal standard affected his specific determination of what rent abatement damages were due.  We therefore remand this issue to the judge for reconsideration of this issue in light of this opinion.

2.  Retaliation.  Moynahan claimed that the landlord sought to evict him from unit 13 in retaliation for his bringing the code violations to the attention of ISD.  Two similar but separate statutory provisions apply to such contentions.  The first, G. L. c. 186, § 18, creates a damages remedy for tenants, while the second, G. L. c. 239, § 2A, creates a defense to summary process actions.  The two provisions generally parallel each other.  Thus, for example, both prohibit the landlord from

retaliating against tenants for engaging in certain protected activities, including reporting code violations.  In addition, both create a presumption that certain actions by a landlord, occurring within six months of the protected activity, are retaliatory.

Because the initial notice to quit was served so close in time to Moynahan's having reported the moisture issues to ISD, the landlord acknowledges that the judge was correct in concluding that Moynahan is entitled to the statutory presumption that it acted in retaliation.  See G. L. c. 186, § 18, as appearing in St. 1978, c. 149, § 1.  Section 18 states that the presumption can "be rebutted only by clear and convincing evidence that [the landlord's] action was not a reprisal against the tenant and that [the landlord] had sufficient independent justification for taking such action, and would have in fact taken such action, in the same manner and at the same time the action was taken, regardless of tenants engaging in, or the belief tenants had engaged in, activities protected under this section."  Ibid.  Clear and convincing evidence means proof that "induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false

or do not exist." <u>Callahan</u> v. <u>Westinghouse Bdcst. Co</u>., 372 Mass. 582, 588 (1977) (citation omitted).

In concluding that the landlord had successfully rebutted the statutory presumption, the judge accepted its claim that Moynahan kept his apartment in a chronic state of dangerous clutter. As Moynahan points out, there is much in the record that arguably calls into question the landlord's claims as to the extent of any clutter problem.[13] Nevertheless, for purposes of our analysis, we assume that there is adequate evidentiary support for the judge's finding that clutter problems existing as of October, 2011, gave the landlord an independent justification for serving Moynahan with the notice to quit. For the landlord to overcome the statutory presumption of retaliation, however, there still would need to be clear and convincing evidence that the landlord in fact would have sent the notice to quit "in the same manner and at the same time

---

[13] For example, the only photos that apparently were introduced to document such clutter are hardly as definitive as the landlord claims (showing, as they do, plastic storage bins stacked on shelving). In addition, as Moynahan accurately points out, although ISD inspectors were in the apartment on numerous occasions to examine the moisture problem and related issues, they did not cite any clutter problem except in September of 2012, when Moynahan claims he was unable to organize his belongings after returning to unit 13 because of "his sensitivity to the new paint and carpet." See 105 Code Mass. Reg. § 410.602(B) (1994). The judge did not explain why he declined to credit ISD's apparent prior lack of concern with clutter in unit 13, while he incongruously found it significant that ISD inspectors did not document a problem with fumes when they were inspecting the apartment in 2012.

. . . regardless of" Moynahan reporting the moisture issues to ISD. See G. L. c. 186, § 18.

The landlord is unable to make such a showing on the current record. There is no evidence that any clutter problem was any worse in October, 2011, than it was in March, 2010, when the landlord first raised the issue with Moynahan. Despite the dire tone of the March, 2010, warnings about clutter, the landlord did nothing to follow up on these issues until Moynahan reported the moisture problem to ISD one and one-half years later. At trial, the landlord offered no explanation for this delay beyond saying that the issue "kind of fell to the wayside." From all that appears before us, the landlord was content to let any clutter issues lie unaddressed so long as Moynahan did not press the mold issue and continued to pay his rent. Under these circumstances, the landlord has not supplied clear and convincing proof that it would have served the October, 2011, notice to quit had Moynahan not sought ISD's assistance in remedying a code violation. The judge's contrary findings are clearly erroneous. Where a tenant has shown that a landlord acted in retaliation, he is entitled to statutory damages not less than one month's rent and not more than three months' rent, or his actual damages, whichever is greater, together with reasonable attorney's fees and costs. G. L.

c. 186, § 18.  We remand the retaliation issue to the trial judge for a determination of appropriate damages.[14]

3.  Chapter 93A.  As the judge recognized, a failure by a landlord to cure a code violation within a reasonable time after notice constitutes a violation of the landlord-tenant regulations that the Attorney General has promulgated pursuant to G. L. c. 93A, § 2(c).  See 940 Code Mass. Regs. § 3.17(1)(i) (1993).  Such a failure constitutes a violation of the statute itself.  See Clark v. Leisure Woods Estates, Inc., 89 Mass. App. Ct. 87, 94 (2016).[15]  Indeed, independent of the Attorney

_____

[14] Moynahan also contends that the December, 2012, notice to quit was served in retaliation for his ventilation complaint. However, he has not articulated why he would have been entitled to the presumption of retaliation set forth in G. L. c. 186, § 18, since the notice to quit was served more than six months after he reported the ventilation issue to ISD.  In any event, because the second notice to quit was based on nonpayment of rent, Moynahan is not entitled, for the purpose of his counterclaim, to the presumption of retaliation.  G. L. c. 186, § 18 ("receipt of any notice of termination of tenancy, except for nonpayment of rent, . . . within six months after the tenant has commenced . . . such . . .complaint shall create a rebuttable presumption that such notice or other action is a reprisal"[emphasis added]).  Unaided by that presumption, Moynahan is unable to demonstrate clear error in the judge's finding that the December, 2012, notice to quit was not undertaken in retaliation for his complaint.  Although Moynahan has argued that he lawfully withheld rent in escrow and that therefore G. L. c. 239, § 8A, recognizes his right to bring a claim pursuant to G. L. c. 186, § 18, he does not argue that such withholding of rent restored the statutory presumption of retaliation.  We therefore need not consider that issue.  See Mass.R.A.P. 16(a).

[15] Nothing in Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 173-175 (2013), is to the contrary.  That case

General's regulations, the Supreme Judicial Court has long recognized that a landlord can violate c. 93A based on a "substantial and material breach of the implied warranty of habitability." Cruz Mgmt. Co. v. Thomas, 417 Mass. 782, 790 (1994).[16]

Of course, this does not mean that such a c. 93A violation would result in the recovery of any additional actual damages, though it may permit actual damages to be multiplied or provide a separate basis for an award of attorney's fees and costs. Ibid. (tenant "not entitled to an additional recovery of actual damages for c. 93A violation" based on condition of apartment, but this could serve as basis of multiple damages and attorney's fees), citing Simon, 385 Mass. at 109-111. Although a tenant is not entitled to duplicative damages for claims arising out of the same conditions, a tenant is entitled to rely on whichever

---

involved a different Attorney General regulation that expansively purported to render any "act or practice [that] fails to comply with existing [laws] meant for the protection of the public's health, safety, or welfare" a per se violation of c. 93A, without further constraining, in any factual way, the "acts or practices" in question or recognizing a reasonable period to cure the underlying noncompliance. See 940 Code Mass. Regs. § 3.16(3) (1993).

[16] Cruz does not stand for the proposition, as Moynahan would have it, that a violation of the warranty of habitability, in and of itself, constitutes a violation of c. 93A. Chapter 93A applies to "unfair or deceptive" conduct, Klairmont v. Gainsboro Restaurant, Inc., supra at 173. In contrast, "[c]onsiderations of fault do not belong in an analysis of [a breach of] warranty" claim. Berman, 379 Mass. at 200.

theory of damages provides him or her the greatest measure of damages. Wolfberg v. Hunter, 385 Mass. 390, 398-401 (1982).

The judge rejected Moynahan's c. 93A claim based on his finding that the landlord acted with alacrity to cure the code violations as soon as it learned of them (delayed only by Moynahan's own conduct). As noted, the judge's endorsement of the landlord's responsiveness is at odds with facts that the landlord conceded. Specifically, the landlord acknowledged that it knew unit 13 had "water issues" even before Moynahan moved in and that it failed to follow up on Moynahan's report of the related mold issues in March, 2010. See 940 Code Mass. Regs. § 3.17(1)(c), (1)(i) (1993). Granted, the landlord claimed that there were severe clutter problems in unit 13 at that time. However, if these problems were as dire as the landlord claimed, it should have followed up on them even though the tenant had caused them. Thus, the fact that the state of the apartment presented multiple serious habitation problems tends to exacerbate rather than excuse the landlord's inaction.

It does not necessarily follow that Moynahan has made out his c. 93A claim. That claim was premised on material code violations, and Moynahan bore the burden of demonstrating when such violations first arose. Because there was no clear error in the judge's finding that Moynahan failed to substantiate any material violations prior to August, 2011, Moynahan cannot rely

on the landlord's inaction before that date to support his c. 93A claim. With the judge having found that the landlord acted promptly once the material violations were brought to his attention in August, 2011, the judge committed no error in dismissing the c. 93A claim.

4. Quiet enjoyment. Finally, we turn to Moynahan's claim that the landlord interfered with his quiet enjoyment, see G. L. c. 186, § 14, by entering the premises without prior notice or authorization.[17] The words "quiet enjoyment" have "little inherent meaning," but their use reflects the statutory incorporation of a "rich background in decisional law." Simon, supra at 102. Relevant here, quiet enjoyment protects a tenant's right to "freedom from serious interferences with [the] tenancy" that "impair the character and value of the leased premises." Ibid.

The judge ruled that there had been no interference with Moynahan's quiet enjoyment because, by signing the lease, Moynahan had given the landlord prior permission to enter for the purposes of inspection and repair.[18] To the extent that the

---

[17] At trial, Moynahan also argued that the moisture and ventilation problems, in addition to constituting a breach of warranty, interfered with his quiet enjoyment. On appeal, he pursues his quiet enjoyment claim based solely on the alleged unlawful entry.

[18] Specifically, section 9(e) of the lease states that the tenant agrees "[t]o permit the [landlord], or his/her agents

judge interpreted the lease as allowing the landlord to enter the premises at any time so long as the entry was for the purpose of inspection or repair, we do not adopt that broad reasoning. See G. L. c. 186, § 14 (lease terms waiving § 14 are void). Rather, we assume arguendo that implicit in the lease were notions of reasonableness and that, barring true emergencies, the parties would seek to negotiate a mutually acceptable time and date for such entry. Given the particular facts of this case as found by the judge, we conclude that the landlord's actions do not rise to the level of a serious interference with the tenancy. We therefore affirm the judge's denial of the quiet enjoyment claim on this ground. See Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997).

Moynahan has identified only one incident that reasonably can be characterized as an unauthorized entry. As noted, in August, 2011, Moynahan reported that his apartment continued to suffer persistent and serious moisture issues that were worsening. The landlord attempted to gain access to Moynahan's unit to inspect the problem the very next day, despite Moynahan's request that the inspection take place at the end of the week when he could be present. The landlord's agent testified that she had been unable to physically enter the unit

. . . to enter the premises for the purpose of making reasonable inspections and repairs and replacements[.]"

because the door was blocked by a large box, but that she had "put [her] head around the door to see the condition of the apartment."

In some circumstances, a single intrusion into a tenant's home may constitute an interference with quiet enjoyment. Cf. Manzaro v. McCann, 401 Mass. 880, 884 (1988) (landlord's failure to silence a ringing smoke alarm for one day violated right to quiet enjoyment). However, the context of the unauthorized entry and the presence of mitigating circumstances are important considerations in determining whether such an entry interfered with the tenant's quiet enjoyment of the rented premises. See United Co. v. Meehan, 47 Mass. App. Ct. 315, 320 (1999).

Here, the judge found, and Moynahan does not dispute, that the landlord's purpose in its limited entry into the property was to address what Moynahan himself characterized as a very serious water leak, a condition likely to cause damage to both Moynahan's property and that of other tenants if ignored. Cf. ibid. (where landlord acts prudently to protect the rights and property of both the tenant and other residents, a single entry did not violate the covenant of quiet enjoyment). Moynahan did not claim that the landlord interfered with his belongings during the entry. Finally, while the landlord's desire to enter the premises immediately may seem inconsistent with its having left the previously reported mold problem unattended for the

prior one and one-half years, the landlord should not be faulted for finally taking the problem seriously. Having reported "seriously unhealthy" and rapidly deteriorating conditions in the apartment warranting "emergency measure[s]," the judge found that Moynahan did not act reasonably in denying the landlord access to address the problem for several days.

In sum, the landlord's entry into the apartment was neither unreasonable nor so significant an intrusion upon Moynahan's possession as to impair the character or value of his tenancy and did not violate G. L. c. 186, § 14. We therefore affirm the judgment in favor of the landlord with regard to Moynahan's alleged breach of the covenant of quiet enjoyment, albeit on narrower grounds than those relied upon by the judge.

5. Attorney's fees. Moynahan has requested, and is entitled to, an appropriate award of attorney's fees and costs for successfully prosecuting his claim for retaliation pursuant to G. L. c. 186, § 18. As to fees relating to this part of the appeal, within fifteen days Moynahan shall submit a statement of his attorney's fees and costs in accordance with the procedure specified in Fabre v. Walton, 441 Mass. 9, 10-11 (2004), and within fifteen days thereafter, the landlord may submit an opposition to the amount requested.

Disposition. We reverse the judgment insofar as it concluded that the landlord did not violate G. L. c. 186, § 18,

and we remand that issue for a determination of damages and for a determination of reasonable attorney's fees and costs incurred in prosecuting that claim in the trial court.  We vacate so much of the judgment that credited Moynahan only a five percent reduction in rent for May through December, 2012, as damages for a breach of the warranty of habitability with respect to the ventilation issues in his apartment, and we remand that issue for further proceedings consistent with this opinion.  The judgment is otherwise affirmed.

<u>So ordered</u>.